BOTT v NATURAL RESOURCES COMMISSION

NICHOLAS v McDANIEL

ATTORNEY GENERAL *ex rel* DEPARTMENT OF NATURAL
RESOURCES v NICHOLAS

Docket Nos. 60947, 62877, 62878. Argued January 8, 1980 (Calendar
Nos. 5, 6).—Decided December 8, 1982.

John A. Bott owns approximately 800 acres of land in Otsego
Township, Otsego County, in fee simple. His property includes
Linton Lake, which covers approximately 35 acres and has an
outlet, also surrounded by Bott's property, which connects it
with Big Chub Lake. Bott sought a declaratory judgment that
Linton Lake, with its connecting outlet, is a non-navigable body
of water, and also sought an injunction against the defendants,
the Natural Resources Commission, the Department of Natural
Resources, and its director, to enjoin them from interfering
with the plaintiff's right to keep the public from entering or
using Linton Lake and its outlet without the plaintiff's permis-

REFERENCES FOR POINTS IN HEADNOTES

[1] 78 Am Jur 2d, Waters §§ 44, 274.
[2, 20] 78 Am Jur 2d, Waters §§ 51, 54.
[3, 9, 15] 78 Am Jur 2d, Waters § 66.
[4] 35 Am Jur 2d, Fish and Game § 11.
   Rights of fishing, boating, bathing or the like in inland lakes. 57
   ALR2d 569.
[5] 26 Am Jur 2d, Eminent Domain § 189.
[6, 23] 20 Am Jur 2d, Courts § 196.
[7] 78 Am Jur 2d, Waters § 72.
[8] 78 Am Jur 2d, Waters §§ 262, 276.
[10, 11, 12, 19] 78 Am Jur 2d, Waters §§ 44, 45.
[13] 35 Am Jur 2d, Fish and Game § 6.
[14] 78 Am Jur 2d, Waters §§ 87, 88.
[16, 26] 78 Am Jur 2d, Waters § 71.
[17] 20 Am Jur 2d, Courts §§ 186, 187.
[18, 21, 22] 78 Am Jur 2d, Waters §§ 62, 65.
[22] 35 Am Jur 2d, Fish and Game § 12.
[24] 26 Am Jur 2d, Eminent Domain § 190.
[25] 73 Am Jur 2d, Summary Judgment § 27.
[27] 78 Am Jur 2d, Waters § 67.

sion. The Ingham Circuit Court, Ray C. Hotchkiss, J., granted a declaratory judgment and permanent injunction for the plaintiff. The Court of Appeals, D. E. Holbrook, Jr., P.J., and D. F. Walsh and Allen, JJ., granted the plaintiff's motion to affirm (Docket No. 77-335). The defendants appeal.

William C. Nicholas and Caroline J. Nicholas own 120 acres of land in Eureka Township, Montcalm County, on either side of Burgess Creek, which connects Burgess Lake with Dogfish Lake, and their property includes frontage on the two lakes. They built a footbridge across Burgess Creek which obstructed the use of small boats on the creek. Five years later they brought an action for trespass and injunctive relief against Russell E. McDaniel and Richard Rademacher, who are owners of property with riparian rights on Burgess Lake, alleging that the defendants' children had trespassed on Burgess Creek. The Attorney General, on the relation of the Department of Natural Resources, brought an action against the Nicholases, claiming that the footbridge had deprived the landowners on Burgess Lake of their right to navigate on Burgess Creek and on the connecting watercourses. The actions were consolidated and the Montcalm Circuit Court, Charles W. Simon, Jr., J., entered a declaratory judgment that Burgess Creek is navigable and enjoined the Nicholases from obstructing public access to the creek. The Court of Appeals, R. B. Burns, P.J., and J. H. Gillis and V. J. Brennan, JJ., affirmed (Docket Nos. 77-5203, 77-5204). The Nicholases appeal.

In an opinion by Justice Levin, joined by Chief Justice Fitzgerald and Justices Kavanagh and Coleman, the Supreme Court *held:*

The creeks involved in these cases which connect smaller lakes with larger lakes are not navigable under the law as it has heretofore been stated, the log-flotation test, and only the littoral owners have a right to use the smaller lakes. The recreational-boating test of navigability is rejected.

1. The case law is that a riparian or littoral landowner holds title to the waterbed to the thread of the waterway, subject to a servitude for commercial navigation of ships and logs and, as an incident, for fishing. A littoral landowner who owns all of the land surrounding a small inland dead-end lake has the sole right to use the lake even though there is a navigable means of access. Where the littoral land is not in unified ownership, the owners have the right to share the reasonable use of the waters, but the rights of the public as incidents of navigational servitudes are not coextensive with the rights of the owners.

There is no servitude for navigation into a dead-end lake where the littoral owners object to public use.

2. Under the early law of this state, the navigability of waterways was determined by their navigability in fact for commercial shipping and rested on the concept that commercial needs justified public use of inland waters. The rule was expanded to include waterways capable of floating logs or timber, but navigability still turned on commercial use. As an incident to such navigational servitudes, the public was held to have a right to fish in streams found to be navigable. Lakes unconnected to other waterways or which had only an inlet or an outlet and which were entirely surrounded by private property were not navigable. Because the rationale for creating servitudes for public access to inland waters was their use as highways of commerce, a dead-end lake surrounded by property whose owner does not permit a boat to dock cannot be used as a highway.

3. The argument in these cases that the rationale for use should be expanded to include recreational use of inland waters, replacing the log-flotation test with a recreational-boating test because of a public need is not supported by the record. There was no showing that the lakes, rivers, and streams now open to the public are inadequate to meet the public need or that a recreational-boating test would significantly increase recreational opportunities. The argument assumes that recreational values should be given paramount consideration and does not attempt to consider competing public values such as the effect of an expansion of recreational usage of inland waterways on the nesting of wildfowl and the propagation of aquatic life, and on the surrounding communities. A convincing demonstration has not been made that the proposed recreational-boating test would implement a widely shared public value which should predominate over competing public values. Additionally, the waterways in these cases are so shallow and narrow as to preclude either commercial or recreational use. What is sought is not the recreational use of an inland waterway, but a means of passage to a dead-end inland lake for recreational use.

4. Use of a recreational-boating test would result in the taking of private property without just compensation. Riparian rights are property. Many formerly private inland waters would be subjected to recreational easements. Enjoyment of the property surrounding previously non-navigable waters would decrease. The private character of the waters adds to the market value of adjacent property. A rule which would open

the waters might render the adjacent property unfit as a refuge or retreat.

5. Established rules of property law are to be strictly followed where the rules have induced extensive reliance. Such rules create value, and the passage of time induces a belief in their stability that generates commitments of human energy and capital. Because of the effect a judicial decision might have on past as well as future property rights, a change in a rule of property law should be avoided. The rights of the public should not be casually enlarged at the expense of property owners who have relied on prior decisions of the Court. Any decision to enlarge the public's right on the basis of competing societal values must be made by the Legislature which has the resources to make a comprehensive inquiry into the public's need for increased water recreation and the effect of a change of law on existing property rights. The Legislature is also in a position to provide compensation for affected owners and to provide protection against overutilization.

The decision in *Bott* is affirmed.

The decision in *Nicholas* is reversed.

Justices Williams and Ryan dissented. They adopted as their own an opinion written by the late Justice Moody in which he would adopt a recreational-boating test of navigability.

1. Each state is free to fashion tests of navigability for determining the right of the public to use its waters so long as the tests do not conflict with federal control over interstate waterways under the Commerce Clause. Waterways within Michigan which are navigable in fact by large vessels engaged in commerce are navigable in law, "strictly navigable", and on them the public right of navigation is paramount to the riparian rights of private owners of the adjacent land. Inland waterways in Michigan which are capable of floating logs or timber have been held to be "qualifiedly navigable" even when the water's capacity to float logs is not continuous. The right of the public to use waters which are qualifiedly navigable is concurrent with that of the riparian landowners. Recognition of the competing uses of these inland lakes and streams resulted in judicial balancing of the rights of the public and the riparian owners. Each of these concurrent rights must be enjoyed reasonably, without any unnecessary interference with the enjoyment of the other, and without negligence. The fact that the title to the bed of an inland waterway in Michigan is in the private hands of the riparian landowner has never been held to thwart recognition of the right of the public to use waters found to be navigable, which is a public trust impressed upon

those waters. The state may not surrender this public trust by grant because it is an essential power of government.

2. The concept of qualified navigability based on the log-flotation test, first announced by the Court in 1853, represented a pragmatic judicial response to the public need for the use of inland waters for lumbering purposes at that time. Because Michigan waters have not been used for logging in most areas for many decades, application of the test has changed and modern cases place greater emphasis on the physical dimensions of the waterway and its current public uses, which have changed from logging and commercial travel to recreational activities. Public activities which are protected by the public trust in all navigable inland waters have been held to include the right to use them for recreational fishing, even in cases which applied the log-flotation test. That test has outlived its usefulness, and its continued application ignores its rationale that concepts of navigability must be fashioned in response to the current use of waterways which the public requires. Whether a particular waterway is navigable is an issue of fact, and soon there will be no witnesses to testify whether a particular lake or stream has ever been used for logging purposes. The doctrine of stare decisis does not require that precedent which has been rendered meaningless by a century of change in the circumstances be followed without thought. The strength of the common-law tradition lies in the Court's duty to insure that the law reflects the needs and values of the society that it is designed to serve. Time and change in the public use of watercourses have made the log-flotation test of navigability an anachronism. Therefore, the test should be rejected for modern determinations of navigability on inland waterways.

3. Instead, the recreational-boating test should be adopted: if inland waters can be navigated by small craft propelled by oar, paddle, or motor, they are navigable and open to the public. So long as access to the waters can be obtained without trespassing upon private property, the public may boat, fish, and exercise other lawful incidents of navigation on them up to the high-water mark.

4. Plaintiff Bott contends that Linton Lake is a private lake from which the public may be excluded because his property surrounds the lake. Wholly private lakes are limited to those having no navigable inlet or outlet which are completely surrounded by the land of one who is the owner in fee. The owner in fee of all the land surrounding a lake which has neither a navigable inlet nor a navigable outlet is entitled to exclude all

others from using the lake. On a lake having more than one riparian owner, each owner holds title to the adjacent portion of the lake bed but must share the right to use the surface of the lake with all other riparian owners and with their licensees. The presence of either a navigable inlet or a navigable outlet to an inland lake indicates that the public has a lawful means of access to the lake and that the lake is navigable under the recreational-boating test. A lake having a navigable inlet and a navigable outlet forms as much a part of a waterway as does a stream or river. If such a lake were held to be private and not for public navigation solely because all the land surrounding the lake is owned by a single person, navigation upon an entire watercourse could be blocked at each such lake.

5. The owner of the land surrounding a lake is much like the person owning land on both sides of a navigable stream or river. The public has a concurrent right to stop for a while and make reasonable recreational use of the water, including activities such as boating and fishing. To hold otherwise would be to abrogate the principle that the navigable waters of the state are protected for public use by a high, solemn, and perpetual trust, which is imposed on all waters which are navigable in fact. One may not trespass upon private lands to reach a lake to use it. However, if access may be obtained by use of a navigable inlet or outlet, by small craft propelled by oars, paddles, or motors, the public may also freely boat and fish upon the lake.

6. Plaintiffs Bott and Nicholas argue that a declaration that the waterways adjoining their lands are navigable would be an unconstitutional taking of their property, by a change in the well-settled rules of property, without just compensation. The issue of the navigability of these waters has not been resolved in any prior litigation. The law of navigability has never been particularly "well-settled" in Michigan because some of the case law is conflicting. The Court has not hesitated to overrule prior cases dealing with rights in real property where rules were formulated in disregard of other decisions of the Court. Adoption of the recreational-boating test only extends the common-law principle that determinations of navigability must reflect the prevailing public need for use of the waterways and harmonizes common-law concepts of navigability with current conditions and uses of inland waters. Recognition of the concurrent right of the public to make reasonable use of the waters of lakes and streams does not constitute a "taking" of the property of the riparian owners because title to the bed of navigable waters has always been held to be subject to the right of the

public to make certain uses of the waters. The determination of public navigational rights is not determinative of the ownership of the bed. Nor would such a decision infringe upon other recognized riparian rights, *e.g.*, the rights of access to the water, enjoyment of the ordinary flow of water past riparian land, and reasonable use of the water for domestic or agricultural purposes upon the surface land. Therefore, no valid argument that property would be taken is presented.

7. Whether a waterway is navigable is an issue of fact; such findings by the trier of fact must be affirmed upon review unless they are against the manifest weight of the evidence. In the *Bott* case the trial court granted a summary judgment for the plaintiff, declaring Linton Lake to be a non-navigable private body of water without deciding whether the lake's outlet is navigable. Affidavits offered in opposition to the motion for summary judgment raised a question of material fact as to the navigability of the outlet. Summary judgment, therefore, was improperly granted.

8. In the *Nicholas* case, the witnesses agreed that small boats had traveled Burgess Creek for approximately 20 years, but disagreed as to whether a small craft could float freely along the stream. The trial court found that boats and canoes could freely float on the creek when propelled by oars or paddles, and in some parts of the stream by motors. There is sufficient evidence on the record to support this finding of navigability, and it should therefore be affirmed. However, the judgment also declared that members of the public may clear away obstructions to free passage through Burgess Creek. This requires clarification: wholesale clearing out of the stream and destruction of trees on the landowner's property is not permissible; the order limits removal of obstructions to achieve the restoration of Burgess Creek to its status as an unobstructed navigable stream. Members of the public have a right to use the waters of a navigable stream; however, they are not entitled to "improve" a stream to make it more readily navigable. No appropriation may be made from the soil, vegetation, or trees located on the banks of the stream.

9. The riparian landowners contend that public use of inland waters necessarily results in noise and water pollution, littering, and trespasses for which they have no adequate remedy. This contention is unpersuasive because on waters which are not strictly navigable the extent of the public right to use the water must be balanced against the rights of the riparian landowners to use the water and the bed and banks of the waterways. Trespasses on private property are prohibited and

may be remedied. Littering and disorderly conduct carry criminal and civil sanctions; the state is expected to insure that the rights of riparian landowners are adequately protected.

88 Mich App 120; 276 NW2d 538 (1979) reversed.

OPINION OF THE COURT

1. NAVIGABLE WATERS — INLAND LAKES — RIPARIAN OWNERS — PUBLIC USE.

    A littoral landowner who owns all of the land surrounding a small inland dead-end lake has the sole right to use the lake and may exclude the public even though there is a navigable means of access.

2. NAVIGABLE WATERS — INLAND LAKES — RIPARIAN OWNERS — PUBLIC USE.

    Littoral land surrounding a small inland dead-end lake which is not in unified ownership is subject to the rights of the landowners to share the reasonable use of the waters, but the rights of the public as an incident of the navigational servitude are not coextensive with the rights of littoral owners.

3. NAVIGABLE WATERS — INLAND LAKES — NAVIGATIONAL SERVITUDE.

    The navigability of an inland waterway depends on its potential for commercial use; an inland waterway which is usable by commercial shipping or which is capable of floating logs or timber is navigable.

4. NAVIGABLE WATERS — NAVIGATIONAL SERVITUDE — RECREATIONAL USE.

    The only recreational use heretofore recognized as an incident of a navigational servitude is fishing.

5. NAVIGABLE WATERS — INLAND LAKES — RIPARIAN OWNERS — JUST COMPENSATION.

    Riparian rights are property and may not be subjected to a significant reduction in use and enjoyment by governmental action without just compensation of the riparian owners.

6. NAVIGABLE WATERS — INLAND LAKES — RIPARIAN OWNERS — STARE DECISIS.

    Established rules of property law which have induced extensive reliance should be strictly followed, and changes in rules of property should be avoided because of the effect the changes might have on past and future property rights; casual enlargement of the rights of the public relative to use of inland

waterways should not be had at the expense of littoral land-
owners who have relied on case law.

DISSENTING OPINION BY WILLIAMS AND RYAN, JJ.

7. NAVIGABLE WATERS — COMMON LAW — INTERSTATE WATERWAYS.

*The courts of each state are free to adopt common-law doctrines
to determine the navigability and public use of waters within
the state's boundaries, provided the tests do not conflict with
federal control over interstate waterways under the Commerce
Clause (US Const, art I, § 8, cl 3).*

8. NAVIGABLE WATERS — RIPARIAN OWNERS — SERVITUDES.

*Waterways within Michigan which are navigable in fact by large
vessels engaged in commerce are navigable in law and are
known as strictly navigable waters; on these waters the public
right of navigation is paramount to the riparian rights of
private owners of the adjacent land.*

9. NAVIGABLE WATERS — RIPARIAN OWNERS — LOG FLOTATION.

*Inland waterways in Michigan which are capable of floating logs
or timber have been held to be qualifiedly navigable even
where the water's capacity to float logs was not continuous; the
right of the public to use these waters is concurrent to that of
the riparian landowners, and each must be enjoyed reasonably,
without any unnecessary interference with the other, and
without negligence.*

10. NAVIGABLE WATERS — UNDERLYING LAND — TITLE — GREAT
    LAKES — PUBLIC TRUST.

*The State of Michigan retains title to the beds of the Great Lakes
and of Lake St. Clair within its boundaries; the title is held in
trust for the people of the state so that they may use the
waters for commerce, navigation, fishing, and recreational ac-
tivities.*

11. NAVIGABLE WATERS — WATERS AND WATERCOURSES — RIPARIAN
    OWNERS — PUBLIC TRUST.

*Title to the beds of all inland waterways in Michigan, other than
the Great Lakes and Lake St. Clair, has been placed in the
riparian owner of the land adjacent to the water; however, this
does not divest the State of Michigan of the public trust
impressed upon all navigable waters, and the title allowed to be
taken by the riparian owners is subject to the public rights to
use waters which are found to be navigable by common-law
standards.*

12. NAVIGABLE WATERS — PUBLIC TRUST.

*The title to the beds of navigable waters in Michigan is impressed with a public trust for the preservation of the public right to use the waters; the state may not, by grant, surrender this public trust because it is an essential power of government, and it is immaterial who owns the soil under the state's navigable waters because the public trust remains.*

13. NAVIGABLE WATERS — FISHING RIGHTS — PUBLIC TRUST.

*The common-law doctrine that the right of fishing in navigable waters follows the ownership of the soil does not prevail in Michigan; the people may fish at their pleasure in navigable waters subject only to the restraints and regulations imposed by the state, and in this right they are protected by a high, solemn, and perpetual trust, which it is the duty of the state forever to maintain (MCL 307.41; MSA 13.1681).*

14. NAVIGABLE WATERS — PUBLIC USE.

*The servitude of the public interest on navigable waters depends upon the public need for the use of the watercourses; hence, in a region where the principal business is lumbering, or the pursuit of any particular branch of manufacturing or trade, the public claim to a right of passage along its watercourses must depend upon their capacity for the use to which they may be made subservient.*

15. NAVIGABLE WATERS — QUALIFIEDLY NAVIGABLE WATERS — LOG FLOTATION.

*The log-flotation test of the navigability of inland waters has outlived its usefulness and continued application of the test where the waters have not been used for logging for many decades does not reflect the rationale of the rule, that the test reflected the current public uses which were required in 1853 when it was announced by the Court; therefore, continued adherence to the log-flotation test is rejected for modern determinations of whether an inland waterway is navigable and thus open to the public for recreational activities as well as commercial uses.*

16. NAVIGABLE WATERS — QUESTION OF FACT.

*Whether a particular waterway is navigable is an issue of fact to be decided by the trier of fact which will be affirmed on review unless the finding of navigability is against the manifest weight of evidence.*

17. COMMON LAW — STARE DECISIS — OVERRULING DECISION.

*The doctrine of stare decisis does not require that precedent*

*which has been rendered meaningless by a century of change in the circumstances be followed without thought; the strength of the common-law tradition lies in the Court's duty to insure that the law reflects the needs and values of society that it is designed to serve.*

18. NAVIGABLE WATERS — RECREATIONAL BOATING — PUBLIC USE.

*If inland waters can be navigated by small craft propelled by oars, paddles, or motors, they are navigable and open to the public; so long as access to the waters can be obtained without trespassing upon private property, the public may boat, fish, and exercise other lawful incidents of navigation on them up to the high-water mark.*

19. WATERS AND WATERCOURSES — INLAND LAKES — RIPARIAN OWNERS — TRESPASS — NAVIGABLE WATERS.

*The owner in fee of all the land surrounding an inland lake which has no navigable inlet or outlet is entitled to exclude all others from using the lake; but if a lake has an inlet or outlet which is navigable and the lake itself is navigable, the public has lawful access to the lake and the right to make reasonable use of the lake's surface waters, which is a right impressed with the public trust which may not be abrogated.*

20. WATERS AND WATERCOURSES — INLAND LAKES — RIPARIAN OWNERS — TRESPASS.

*Each landowner on an inland lake having more than one riparian owner holds title to the adjacent portion of the lake bed to the center of the lake but must share the right to use the surface of the lake with all other riparian owners and with persons who are their licensees on lakes to which the general public otherwise has no right of access by land, or by a navigable inlet or outlet.*

21. NAVIGABLE WATERS — INLAND LAKES — PUBLIC USE — RECREATIONAL BOATING — FISHING RIGHTS.

*People having lawful access to inland lakes which are capable of being navigated by small craft propelled by oars, paddles, or motors may boat upon and fish in the waters, provided that they do not trespass on fast and privately held lands.*

22. NAVIGABLE WATERS — INLAND LAKES — PUBLIC USE — RECREATIONAL BOATING — FISHING RIGHTS.

*Members of the public having lawful access to a particular waterway may also freely boat and fish upon an inland lake which may be reached on the waterway by use of an inlet or*

*outlet which is capable of being navigated by small craft propelled by oars, paddles, or motors.*

23. COMMON LAW — STARE DECISIS — RULES OF PROPERTY — OVER-RULING DECISION.

*The doctrine of stare decisis is more strictly followed where property rights, especially rights in real property, are concerned and where rights have become vested in reliance on the precedents; but the Court has not been hesitant to overrule prior cases dealing with rights in real property where the rules stated were formulated in disregard of other well-reasoned decisions of the Court.*

24. CONSTITUTIONAL LAW — NAVIGABLE WATERS — PUBLIC USE — RIPARIAN OWNERS — TAKING PRIVATE PROPERTY.

*Recognition of the concurrent right of the public to make reasonable use of the waters of lakes and streams for recreational purposes does not constitute a "taking" of the property of the riparian landowners under the state constitution where the navigability of the specific waterway is an issue which has not been resolved in any prior litigation; title to the bed of navigable waters has always been held to be subject to the right of the public to make certain uses of the waters and the decision does not infringe upon other recognized riparian rights of the landowner (Const 1963, art 10, § 2).*

25. WATERS AND WATERCOURSES — INLAND LAKES — NAVIGABLE WATERS — QUESTION OF FACT.

*Summary judgment declaring as a matter of law that an inland lake which is surrounded by land owned by the plaintiff in fee is a private body of water, from which the public may be excluded, was improperly granted where the trial court did not decide whether the lake's outlet is navigable and where the navigability of the outlet was disputed by the parties (GCR 1963, 117.2[3]).*

26. NAVIGABLE WATERS — QUESTION OF FACT — RECREATIONAL BOATING — RIPARIAN OWNERS.

*A finding of fact that a creek is a navigable watercourse, and therefore that the riparian owner of all the land on either side of the creek may not exclude members of the public from reasonable use of its waters, is sufficiently supported by the evidence where the witnesses testified that small boats and canoes had traveled on the creek for approximately 20 years and they disagreed only as to whether the boats could float freely on the creek when propelled by oars, paddles, or motors.*

27. NAVIGABLE WATERS — PUBLIC USE — RIPARIAN OWNERS — TRES-
PASS.

*Members of the public have a right to make reasonable use of a
navigable stream, but they are not entitled to improve a stream
to make it more readily navigable; no appropriation may be
made of the soil, vegetation, or trees located on the banks of
the stream.*

*Casey, Cavanaugh & O'Neill* for plaintiff Bott.

William C. Nicholas and Caroline J. Nicholas, *in
propriis personis.*

*Frank J. Kelley,* Attorney General, *Louis J.
Caruso,* Solicitor General, and *Frank J. Pipp*
and *Terrence P. Grady,* Assistants Attorney Gen-
eral, for Director of the Department of Natural
Resources, the Department of Natural Resources,
the Commission of Natural Resources, and the
people.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *Don-
ald A. Hines* and *David E. S. Marvin),* for defen-
dants McDaniel and Rademacher.

Amicus Curiae:

*Peter W. Steketee* for Michigan United Conser-
vation Clubs, Inc.

LEVIN, J. Littoral owners on 75-acre Big Chub
Lake (in *Bott)*[1] and 60-acre Burgess Lake (in *Nicho-*

---

[1] The circuit court granted Bott's motion for summary judgment,
without deciding factual questions, on the authority of *Michigan
Conference Ass'n of Seventh-day Adventists v Natural Resources
Comm,* 70 Mich App 85; 245 NW2d 412 (1976), which was decided on
the authority of *Winans v Willetts,* 197 Mich 512; 163 NW 993 (1917),
discussed below.

An affidavit filed by an employee of the DNR states "there is a
public access site on Big Chub Lake". If there is a public access site
(cf. *McCardel v Smolen,* 404 Mich 89, 96, 98; 273 NW2d 3 [1978]), then
the members of the public who have access to that site have the same
right to use the waters as does a littoral owner.

*las)* seek, with the Department of Natural Resources, over the objections of Bott and the Nicholases, access through connecting creeks to nearby 35-acre lakes.

Bott owns all the land surrounding both 35-acre Linton Lake and the creek connecting it with Big Chub Lake.[2] The Nicholases own 7/8 of the land surrounding 35-acre Dogfish Lake and all the land surrounding the creek connecting Dogfish Lake with Burgess Lake.[3]

---

[2] The land is located in Otsego County.

Linton Lake has no inlet and one outlet. Big Chub Lake has numerous riparian owners, and there may be a public access site.

Bott sought a declaratory judgment that Linton Lake and the creek were not navigable and were private bodies of water.

The DNR filed two affidavits opposing the motion. The first states that the creek is 240 feet long and varies in width from 100 feet to 15 feet. The affidavit indicates that the water was approximately 2 feet deep except for one point where it is 8 inches deep. The second affidavit states that the average width of the creek is 20 feet and that a small oar- and motor-propelled craft can pass through the creek without making contact with the bed or banks.

The circuit court granted Bott partial summary judgment declaring Linton Lake to be a "private lake" from which the public could be excluded, but expressed no opinion on the navigability of the creek. The Court of Appeals granted a motion to affirm on the authority of *Michigan Conference Ass'n of Seventh-day Adventists v Natural Resources Comm, supra.*

Our order granting leave to appeal directed the parties "to include among the issues to be briefed whether Linton Lake is a private inland lake". 406 Mich 1006 (1979).

[3] The land is located in Montcalm County.

The eastern boundary of the Nicholas property is Burgess Lake and the western boundary is Dogfish Lake. Burgess Lake is spring-fed and has one outlet, Burgess Creek. Burgess Creek is approximately 800 feet long and connects Burgess Lake with Dogfish Lake.

In 1971, to prevent their neighbors from gaining access to Dogfish Lake, the Nicholases erected a bridge across Burgess Creek. The bridge was built low to the water, and even the smallest craft was unable to pass beneath it. Despite this obstacle, the Nicholases' neighbors continued to use Burgess Creek, pulling their boats over or portaging around the bridge.

When the bridge proved ineffective, the Nicholases filed an action for trespass against two of their neighbors, Russell McDaniel and Richard Rademacher, and asked the circuit court to declare Burgess Creek not to be navigable and to be private property and to enjoin any further passage on it.

The defendants sought assistance from the DNR. Other property owners on Burgess Lake had made similar requests, and a recent Court of Appeals decision, *Attorney General ex rel Director of the Dep't of Natural Resources v Hallden,* 51 Mich App 176; 214 NW2d 856 (1974), had adopted the recreational-boating test. The DNR filed an action against the Nicholases, and the two actions were consolidated.

There is no public access site on Burgess Lake.

A surveyor for the DNR testified that Burgess Creek varies in width from 52 feet to 7-1/2 feet, and that the depth of Burgess Creek varies from 14.4 inches to 6 inches with frequent readings of 6, 8 and 11 inches. Measurements of the sediment in Burgess Creek showed that it varies in thickness from 1 to 2-1/2 feet. Wading was difficult, if not impossible. Other witnesses corroborated his testimony, stating that a person who tried to walk in Burgess Creek would sink into the sediment, and that on one occasion a rowboat had been stuck in it.

The evidence showed that Burgess Creek had never been deep enough to support the flotation of logs. Witnesses presented by both parties chronicled the physical transformation of Burgess Creek from the early 1950's to the present. At the beginning of this period, Burgess Creek was impassable because it was covered by heavy brush and clogged by numerous trees. In the late 1950's and the early 1960's, the character of the stream began to change as more riparian owners on Burgess Lake began to use it. At the time, those who desired to traverse Burgess Creek had to lie down in their boats to avoid overhanging trees and to rock their boats over trees lying in the creek bed. As the years passed, many of these trees were removed by those who desired to travel without hindrance. A number of witnesses testified that, at present, Burgess Creek was so shallow that a boat could not float freely on it. At some point during the journey, a person had to get out of his boat and push or pull it along.

A DNR employee testified, however, that he had floated a canoe through Burgess Creek, although he conceded that at one point he may have been forced to touch bottom to avoid a tree lying in the creek. He acknowledged that in 1971 the DNR had issued an opinion declaring that Burgess Creek was not navigable.

The circuit court found against the Nicholases on the authority of the Court of Appeals decision in *Attorney General ex rel Director of the Dep't of Natural Resources v Hallden, supra,* and the testimony that recreational boats might pass through Burgess Creek. The Court declared Burgess Creek to be navigable, ordered the footbridge removed, and enjoined further obstruction of public access.

The Court of Appeals affirmed. It said that the dead-end lake cases, *Michigan Conference Ass'n of Seventh-day Adventists v Natural Resources Comm, supra,* and *Winans v Willetts, supra,* are "of limited applicability" to the case at hand. It stated that Burgess Creek "is valuable for travel by boat or canoe between" Burgess Lake and Dogfish Lake and that the circuit court was therefore "correct" in finding it to be navigable. The Court had, earlier in its opinion, adverted to *Attorney General ex rel Director of the Dep't of Natural Resources v Hallden,* and had observed that the circuit court found that Burgess Creek was navigable on the authority of that decision,

The creeks connecting the two lakes are, in both cases, relatively narrow and are shallow. The depth, at one point, is eight inches in *Bott*[4] and six inches in *Nicholas.*

The established law of this state is that the title of a riparian or littoral owner includes the bed to the thread or midpoint of the water,[5] subject to a servitude for commercial navigation of ships and logs,[6] and, where the waters are so navigable, for fishing.[7]

In the instant cases, it appears that the creeks connecting the smaller with the larger lakes are too shallow to permit the flotation of logs. The creeks are, therefore, not navigable under the law as it has heretofore been stated, and only the littoral owners have a right to use the lakes.

Prior case law also provides that although there is a navigable means of access, the littoral owner of all the land surrounding a small inland dead-end lake has the sole right to use it. *Winans v Willetts,* 197 Mich 512; 163 NW 993 (1917).

---

but this panel of the Court of Appeals did not rest its decision thereon. *Nicholas v McDaniel,* 88 Mich App 120; 276 NW2d 538 (1979).

Our order granting leave to appeal directed the parties to include among the issues to be briefed: (1) "what is the legal test and measure of whether a body of water is 'navigable' so as to impose a public trust on such body"; (2) "did the Court of Appeals properly determine that Burgess Creek was 'navigable'?" 406 Mich 1007 (1979).

[4] As previously noted (see fn 1), *Bott* was decided on a motion for summary judgment without deciding factual issues. The affidavit of an employee of the DNR states that the creek has a depth of approximately two feet except under the bridge where it has a depth of approximately eight inches, and that the eight-inch depth is the result of the placement of fill for purposes of creating bridge approaches and for road surface, such fill having eroded and sifted through the bridge deck into the channel.

[5] See *Lorman v Benson,* 8 Mich 18; 77 Am Dec 435 (1860).

[6] See *Moore v Sanborne,* 2 Mich 519; 59 Am Dec 209 (1853).

[7] See *Collins v Gerhardt,* 237 Mich 38; 211 NW 115 (1926); *Attorney General ex rel Director of Conservation v Taggart,* 306 Mich 432; 11 NW2d 193 (1943); *Kerley v Wolfe,* 349 Mich 350; 84 NW2d 748 (1957).

The only recreational use heretofore recognized by this Court as an incident of the navigational servitude is fishing.[8]

The dissenting opinion would change established rules of property law in the following respects:

(1) It would substitute a recreational-boating test for the log-flotation test of determining navigability stated in *Moore v Sanborne,* 2 Mich 519; 59 Am Dec 209 (1853).

(2) It would overrule the dead-end lake rule stated in *Winans v Willetts.*[9]

(3) It would enlarge the recreational use permitted in navigable waters beyond fishing to include "the right to make reasonable use of the lake's surface" for "navigation, fishing, and recreational use".[10]

It is proposed to make the foregoing changes in property law to meet "current public needs".[11] It has not been demonstrated, however, that a change of the law is needed to accommodate the needs of the public or that the proposed changes will, in general, do more than, as in the instant cases, enlarge the recreational access of one group of littoral owners and users who have access to one lake and desire to have access to another lake.

The rules of property law which it is proposed to change have been fully established for over 60 years, and the underlying concepts for over 125

---

[8] See fns 15 and 16.

In *McCardel v Smolen,* 404 Mich 89, 96; 273 NW2d 3 (1978), the public had access to the lake from the dedicated streets, and the right to use the lake as a littoral owner. This Court noted that the Attorney General claimed that the general public had the right to use the lake and the land lying beneath the waters "for the purposes of boating, swimming, wading and fishing, which he *asserts* is an incident of the right of navigation". (Emphasis supplied.)

[9] *Post,* pp 110, 111.
[10] *Post,* pp 110, 123.
[11] *Post,* p 111.

years. Riparian and littoral land has been purchased in reliance on these rules of law, and expenditures have been made to improve such land in the expectation, based on decisions of this Court, that the public has no right to use waters not accessible by ship or wide or deep enough for log flotation, and that, even if there is navigable access to a small inland dead-end lake, the public may not enter over the objection of the owner of the surrounding land, and that the only recreational use recognized by this Court as an incident of the navigational servitude is fishing.

The Legislature can, if it is thought to be sound public policy to enlarge public access to and the use of inland waters, pass laws providing for the enlargement of the rights of the public in those parts of the state where the Legislature finds that there is a shortage of public access to inland rivers and lakes and for the compensation of landowners affected by the enlarged servitude.

In the cases decided in other jurisdictions where a recreational-boating test was approved and applied, the body of water was of sufficient depth and width to permit its actual use for recreational purposes.[12]

The recreational-boating test, applied to a body of water of sufficient width and depth to be usable for recreational purposes, may not differ significantly from the log-flotation test. Adoption of the recreational-boating test, in such a case, might not significantly change or enlarge the servitude imposed by the log-flotation test. In the instant cases, however, the watercourses connecting the smaller with the larger lakes are not of sufficient depth to be used for recreational purposes. There is more water in a wash basin and considerably more in a

---

[12] See fn 39 and the accompanying text.

bathtub than the eight inches in *Bott* and the six inches in *Nicholas* at the shallowest points.

What is here sought is not a recreational use of the intervening watercourses, but rather use of them as a means of passage to a body of water which can then be used for recreational purposes. This contrasts with the navigational servitude for the passage of ships and logs, which arose only if the waterway was of sufficient width and depth to permit its use for the commercial purpose thought to justify the servitude. Because the intervening watercourses in the instant cases are not of sufficient width and depth to be used for recreation, subjecting those watercourses to an enlarged servitude cannot be justified on the premise that there is a public need to use the watercourses for recreation in the same sense that there was a public need to use the rivers, lakes, and the larger streams for commercial navigation of ships and logs.

If it is thought that the needs of littoral owners or of the public having access to one navigable lake[13] for recreation on a nearby navigable lake justifies creation by judicial pronouncement of a right of passage between the lakes, it should make no difference whether the intervening waterway can be traversed by canoe or a twig or, indeed, whether there is only a trickle of water or, perhaps, even no water at all. Since the rationale of the proposed right of passage does not require that the intervening waterway be actually usable for recreation, the rationale would justify a further expansion to meet perceived public needs and the creation by judicial pronouncement of a right of

---

[13] The term "navigable lake" is here used to convey the thought that the waters are wide and deep enough to be "qualifiedly navigable" (log flotation) and not in the technical sense of being open to the public.

passage or portage along a trickle of water, a desiccated gully, or other dry land between nearby navigable lakes.

The precept that a servitude will not be extended beyond the purpose for which it was granted explains the holding in *Winans* that a small inland dead-end lake is not open to the public, although there is a navigable means of access, if all the surrounding land is in unified ownership. In such a case, no ship can dock, and logs cannot be floated to or from the land without the permission of the owner. Where the owner objects, no use can be made of a right of passage, and, hence, there is no servitude for navigation although there is a navigable means of access to the dead-end lake.

Riparian and littoral owners have the right to share the reasonable use of the waters,[14] but the rights of the public as an incident of the navigational servitude are not coextensive with the rights of riparian and littoral owners. While this Court, in *Collins v Gerhardt,* 237 Mich 38; 211 NW 115 (1926), and *Attorney General ex rel Director of Conservation v Taggart,* 306 Mich 432; 11 NW2d 193 (1943), recognized fishing as an incident of the navigational servitude in inland rivers and lakes, it has held that fowling and hunting is not,[15] and

[14] *McCardel v Smolen,* 404 Mich 89; 273 NW2d 3 (1978); 78 Am Jur 2d, Waters, § 263, p 707.

[15] See fn 7 and the accompanying text.

This Court has not extended the scope of the navigational servitude to include hunting, trapping, and fowling. In *Sterling v Jackson,* 69 Mich 488, 497, 501; 37 NW 845 (1888), the Court said:

"[Defendant] had no right to construct a 'hide', nor to anchor his decoys for the purpose of attracting ducks within reach of his shotgun. Such acts are not incident to navigation, and in doing them defendant was not exercising the implied license to navigate the waters of the bay, but they were an abuse of such license.

* * *

"The public had a right to use it as a public highway, but every other beneficial use and enjoyment belonged to the owner of the soil."

that the ice belongs to riparian and littoral own-
ers.[16]

This Court has not been called upon to decide
whether, and the extent to which, boating, as
such,[17] and other recreational uses are incidents of
the navigational servitude and whether a distinc-
tion should be drawn in that regard between (i)
waters in which riparian or littoral owners do *not*
own the bed (the Great Lakes), (ii) waters in which
they own the bed and which are navigable in fact
(by ship), (iii) waters in which they own the bed
and which are qualifiedly navigable (by log flota-
tion), and (iv) assuming adoption of a recreational-

In *Ainsworth v Munoskong Hunting & Fishing Club*, 159 Mich 61,
64-65; 123 NW 802 (1909), the Court said:

"The sole question now before us is whether Munoskong Bay is
included in the waters of Lake Huron or whether it borders on the
river. If the former, the defendant has no exclusive rights of hunting
and fishing, and the decree of the court is right. If the latter, then the
defendant owns the subaqueous land to the middle thread of the
river, and the decree is wrong."

The Court held that a riparian owner could bar the public from
hunting and fishing. This, of course, was before *Collins* and *Taggart*
extended the navigational servitude to include fishing.

In *Johnson v Burghorn*, 212 Mich 19, 29; 179 NW 225 (1920), the
Court said:

"[D]efendant had no right to anchor his traps in the submerged
lands, or to cut holes in the ice and fix stakes thereto, holding traps."

And in *Sewers v Hacklander*, 219 Mich 143, 153; 188 NW 547
(1922), the Court said:

"Hunting and trapping are not incidents of the right of navigation."
See *Hall v Wantz*, 336 Mich 112; 57 NW2d 462 (1953).

[16] See *Lorman v Benson*, 8 Mich 18; 77 Am Dec 435 (1860); *People's
Ice Co v The Steamer "Excelsior"*, 44 Mich 229; 6 NW 636 (1880);
*Clute v Fisher*, 65 Mich 48; 31 NW 614 (1887); *Bigelow v Shaw*, 65
Mich 341; 32 NW 800 (1887); *Grand Rapids Ice & Coal Co v South
Grand Rapids Ice & Coal Co*, 102 Mich 227; 60 NW 681 (1894).

[17] In *Kerley v Wolfe*, 349 Mich 350, 356; 84 NW2d 748 (1957), the
dispute, again, involved fishing rights. In describing the holding in
*Collins*, where the fishermen waded into the water (as in *Taggart*), the
Court said:

"So long as boatable waters stand or flow in the upper reaches of
this inland lake, people having lawful access to such waters may boat
upon *and* fish in the same, provided they trespass not on fast and
privately held lands *(Collins*, p 49 of report)." (Emphasis supplied.)

boating test, large and small inland rivers and lakes.

Fishing is a quiet sport. General boating and water recreation can, however, be intrusive and jarring.

Even if this Court decides to expand upon *Moore v Sanborne* by substituting a recreational-boating test for the log-flotation test, and to overrule *Winans* concerning small inland dead-end lakes, thereby enlarging fishing rights in waters heretofore private because the means of access thereto is not log-floatable or the lake dead ends, it should not assume that, but separately consider when the issue is presented and argued whether, the case has been made to allow general boating and water recreation, as an incident of the navigational servitude, by persons other than riparian and littoral owners on inland waters heretofore inaccessible under established rules of property law.

I

The recreational-boating test is characterized in the dissenting opinion as a natural outgrowth of the rationale of *Moore v Sanborne,* where this Court expanded the common-law rule that waterways usable by ships in commerce are navigable, to include waterways capable of floating logs or timber.[18]

---

[18] Within broad federal constitutional limits, the state courts have the common-law power to choose the standards governing such determinations. See *Fox River Paper Co v Railroad Comm of Wisconsin,* 274 US 651, 655; 47 S Ct 669; 71 L Ed 1279 (1927); *Brewer-Elliott Oil & Gas Co v United States,* 260 US 77, 89; 43 S Ct 60; 67 L Ed 140 (1922); *Wear v Kansas ex rel Brewster,* 245 US 154, 158; 38 S Ct 55; 62 L Ed 214 (1917); *Donnelly v United States,* 228 US 243, 262; 33 S Ct 449; 57 L Ed 820 (1913); *Southern Idaho Fish & Game Ass'n v Picabo Livestock, Inc,* 96 Idaho 360; 528 P2d 1295 (1974); *State v Bunkowski,* 88 Nev 623, 628; 503 P2d 1231 (1972); 1 Clark, Waters and Water Rights, § 37.4(A), pp 212-213.

*Moore* does not support the claim that public
needs other than for commercial use justify expan-
sion of the servitude. In adopting the log-flotation
test, *Moore* advanced the same interests—encour-
agement of commerce and industry—as had been
encouraged when England expanded the concept of
navigability to include inland waters capable of
serving as public highways. *Moore* is replete with
references to "valuable floatage" and the "necessi-
ties of trade and commerce", and of the need to
use the rivers and streams to develop forest and
mineral wealth.[19]

The navigable-in-fact commercial shipping test
antedating *Moore* rested on the concept that com-

---

[19] "The servitude of the public interest depends rather upon the
purpose for which the public requires the use of its streams, than
upon any particular mode of use—and hence, in a region where the
*principal business is* lumbering, or the pursuit of any particular
branch of *manufacturing or trade,* the public claim to a right of
passage along its streams must depend upon their capacity for the use
to which they can be made subservient. In one instance, perhaps,
boats can only be used *profitably,* from the nature of the product to be
transported—whilst, in another they would be utterly useless. Upon
many of our streams, although of sufficient capacity for navigation by
boats they are never seen—whilst rafts of lumber of *immense value,*
and mill logs which are counted by thousands, are annually floated
along them *to market.*

* * *

"We have a large territory undeveloped, rich in forests and in
mineral wealth—washed by vast bodies of water upon three sides, and
threaded by innumerable streams which are capable of navigation,
many of which are, and many others of which may be made servicea-
ble in developing its resources—and with a commerce already estab-
lished, rivaling in extent, that of some of the Atlantic States, and
rapidly growing under the influence of increasing population, settle-
ments, and wealth, it is of the first importance that the rights of the
public be recognized, to the free use of all streams susceptible of any
valuable floatage. In this commerce, lumbering interests sustain, and
will continue to sustain an important part, and their success depends
to a vast, if not entire extent, upon this principle. Indeed, a moment's
reflection will convince us that a liberal application and retention of
the common law rule, and its adaptation to our condition and wants,
lies at the bottom of this branch of our trade." *Moore v Sanborne,* 2
Mich 519, 525-526, 524; 59 Am Dec 209 (1853).

mercial needs justified public use of inland waters. *Moore*, drawing on that concept, recognized that Michigan's waterways could be put to commercial uses other than ferrying goods by ship. The log-flotation test reflected this differing commercial reality and a commonly accepted public need.[20] The rationale remained unchanged; navigability turned on commercial use.[21]

*Collins* and *Taggart* hold only that the public may fish in streams found navigable under the rule of *Moore v Sanborne. Collins* and *Taggart* voiced no dissatisfaction with the log-flotation test, and applied that test to determine the navigability of the streams in question.

## II

Prior to *Winans*, this Court had held in *Giddings v Rogalewski*, 192 Mich 319; 158 NW 951 (1916), that a lake entirely surrounded by private property was not navigable. *Giddings* reasoned, on the basis of the rationale of *Moore v Sanborne*, that a lake unconnected to other waterways could not form part of an aquatic highway for "commerce, trade, and travel * * * by the usual and ordinary modes of navigation" and that thus there was no justification for a navigational servitude.

Although *Winans* did not elaborate on the reasons for decision, its conclusion is consistent with

---

[20] For a discussion of the history of water transportation in Michigan, see Bald, *Michigan in Four Centuries* (rev ed), 151-152, 243-247 (New York: Harper, 1961); Dunbar, *Michigan: A History of the Wolverine State*, 245-246, 358-360 (Grand Rapids: Eerdmans, 1965); Fuller, *Economic and Social Beginnings of Michigan*, 22-33, 96-99, 127-138 (Lansing: Wynkoop-Hallenbeck-Crawford, 1916).

[21] In *Burroughs v Whitwam*, 59 Mich 279; 26 NW 491 (1886), this Court held that public use of a river for fishing and pleasure-boating has no tendency to prove navigability.

the rationale of *Giddings* and *Moore*.[22] The ratio-

[22] In *Moore* and subsequent decisions, this Court referred to waters deemed navigable as public highways or thoroughfares; in *Moore* the Court said that the question to be decided was "is Pine River a public highway". 2 Mich 521.

In *Grand Rapids Booming Co v Jarvis,* 30 Mich 308, 319 (1874), this Court indicated that only those rights incident to and reasonably necessary to exercise the right to float logs could be exercised by the public in waters merely floatable.

"This river, so far as it is navigable for vessels, or floatable for logs, is but a public highway by water; the right to navigate the one or float the other is but a right of passage, including only such rights as are incident to *that right* and necessary to render it reasonably available." (Emphasis in original.)

A year later, in a case where the question was whether a riparian owner could artificially increase the flow of a river to float logs to market, this Court said that waters found navigable under the rule of *Moore* were merely periodic highways and could not be made floatable at other times because to do so would appropriate valuable riparian rights of the downstream riparian owners. *Thunder Bay River Booming Co v Speechly,* 31 Mich 336 (1875). In explaining the rule set forth in *Moore* and in cases from other jurisdictions the Court said:

"The highway they recognize is one *sui generis,* and in which the public rights spring from peculiar facts. It is a public highway by nature, but one which is such only periodically, and while the natural condition permits of a public use. During that time, the public right of floatage and the private right of the riparian proprietors must each be exercised with due consideration for the other, and any injury which the latter receives in consequence of a proper use of the stream for floatage, he must submit to as incident to his situation upon navigable waters.—*Middleton v [Flat River] Booming Co,* 27 Mich 533 (1873). But at periods when there is no highway at all, there is no ground for asserting a right to create a highway by means which appropriate or destroy private rights. The doctrine that this may be done without compensation to parties injured, is at war with all our ideas of property and of constitutional rights."

Similarly, see *Grand Rapids v Powers,* 89 Mich 94, 111; 50 NW 661 (1891).

The nature of the public servitude set forth in the early cases was expanded by *Collins.* In *Collins,* this Court held that a stream formerly used for floating logs did not lose its character as a navigable stream by a period of nonuse because it is the capacity of the stream and not the frequency of its use which determines its navigability.

It is apparent that at first the servitude was considered limited to the commercial flotation of logs and all activity incident thereto and existed only during the periods when such flotation could be carried on. *Collins* expanded the permissible use of the public as an incident of the navigational servitude to include fishing and declared the servitude to be permanent, but neither that decision nor *Taggart* declared a stream formerly non-navigable under *Moore* to be navigable. The only change was in the degree of public use permitted.

nale for creating a servitude for public access to inland waters is for use as highways of commerce. Highways must begin and end. No businessman would guide a ship or logs through waterways without a port of call. A dead-end lake surrounded by property whose owner will not permit a boat to dock cannot be used as a highway.[23] As noted in *Giddings*, p 325, "[i]t is difficult to conceive of a highway beginning, extending its whole length, and ending, in the interior of the private estate of a single owner."[24]

---

After *Giddings*, this Court declared other lakes without either an outlet or an inlet to be non-navigable. *Pigorsh v Fahner*, 386 Mich 508; 194 NW2d 343 (1972); *Putnam v Kinney*, 248 Mich 410; 227 NW 741 (1929). The reasoning in these cases is the same as in *Giddings*, and consideration of them sheds no further light on *Winans*.

We are told that there are few "wholly" private lakes from which the public may be excluded. For on lakes having more than one littoral owner, all share the surface of the lake as a common, *Burt v Munger*, 314 Mich 659; 23 NW2d 117 (1946); *Bauman v Barendregt*, 251 Mich 67; 231 NW 70 (1930), and littoral owners have the right to license public use of their waters, *Beach v Hayner*, 207 Mich 93, 98; 173 NW 487 (1919); *Snively v Jaber*, 48 Wash 2d 815; 296 P2d 1015 (1956).

The relevance of these rules to the present case is unclear. The first group of cases involves the relative rights of private parties *inter se* and has no relation to the question of the permissible extent of public use. The second group of cases demonstrates that the public cannot win access to private lakes without littoral consent, and thus highlights the strength of littoral property rights, not the weakness.

[23] The holding in *Winans* is limited to a dead-end lake and does not include a lake surrounded by the property of a single owner which has an inlet and outlet leading to land where boats might lawfully dock. In such a case, the lake could serve a useful commercial function. See *Hall v Wantz*, 336 Mich 112, 113; 57 NW2d 462 (1953).

[24] A passage from this Court's opinion in *Kerley v Wolfe*, 349 Mich 350, 356; 84 NW2d 748 (1957), is cited:

"So long as [the navigable] waters stand or flow in the upper reaches of this inland lake, people having *lawful access* to such waters may boat upon and fish in the same, provided they trespass not on fast and privately held lands". (Emphasis supplied.)

In that case, defendants erected a fence across the neck of a lake, thereby excluding riparian owners at the lower end of the lake from passing to its upper end. The question presented was whether the enclosed area was navigable in fact. After reviewing the evidence, this Court found that the trial court's factual findings and legal conclusions were not erroneous. As riparian owners, there was no question

The public-trust doctrine applies only to *naviga-ble* waters and not to all waters of the state.[25] The public trust does not attach to lakes unconnected to other waterways or to lakes with only one inlet or outlet held in *Winans* not to be navigable. In *Taggart,* p 443, the Court sought to allay concern about the scope of the holding:

"The instant case does not in any way affect very small trout streams on private property which have not been used by the public for logging or for boating; *Burroughs v Whitwam,* 59 Mich 279; 26 NW 491 (1886);[26] nor does it cover private lakes and ponds owned by the abutting property owners. As to such bodies of water, the riparian owner has complete control."

## III

It is said that the log-flotation test is an ana-

---

that plaintiffs had "lawful access" to the water. The issue posed in *Winans,* whether the public should have "lawful access" to dead-end lakes, was not considered.

[25] *Collins,* in holding that there was a right to fish in navigable waters, declared that all *navigable* waters, *even qualifiedly navigable ones,* were impressed with a public trust.

*Taggart,* in turn, followed *Collins. Taggart,* p 441, acknowledged that prior to *Collins* a number of cases "distinguished between streams navigable for boats and those floatable for logs and, with respect to the latter, gave the public an easement of passage for the purpose of floatage and only such other rights as are incident thereto". This approach—limiting public recreational uses to strictly navigable streams—was rejected by *Taggart* because it believed that *Collins* stated "sound law and a public policy appropriate to * * * this State". Additionally, the Court noted that the stream in question, which "had been used for floating logs when the water was high ["3 to 4 feet"] because of spring freshets or a heavy rainy season", was stocked at state expense with the riparian owners' knowledge, and although the Court did not go so far as finding that this created an estoppel against the property owners it obviously was influenced by the equities which this point raised.

[26] See fn 21.

chronism and is difficult to administer.[27] When this Court examines the need for a change of law, it focuses on whether the proposed change is consonant with widely shared societal values, fairly treats those who have relied on past law, and is appropriate for judicial implementation.[28]

## A

It is asserted that the recreational-boating test will meet a public need for access to recreational waters. Even if one accepts the premise that public need justifies such a change in the law, the public's need for expanded recreational uses stands before this Court as a bare, undocumented claim without support in the record or in any materials to which our attention has been directed.

[27] The impracticability of the log-flotation test, like the public need for enlarged access to recreational waters, is more assumed than shown. In many cases, there will undoubtedly be evidence whether a waterway was used for floating logs at an earlier time. Such evidence might justify a determination of navigability. If no reliable history is available, a litigant could produce evidence in at least two other ways. He might obtain a number of large logs and float them down the stream in question. Alternatively, he could establish navigability by surveying the body of water as the DNR did in the instant cases and comparing its dimensions (width, depth, rate of flow) to the reported dimensions of streams already found to be navigable. Comparison as well as other evidence would allow a court to make a sound determination without changing the test of navigability. Neither of these methods is so burdensome as to be impractical and would produce results closely approximating the historical test.

Further, it is unclear how frequently determinations of navigability will need to be made in the future. The navigability of many of the rivers, lakes, and streams of this state has already been judicially determined.

[28] Compare *Placek v Sterling Heights*, 405 Mich 638; 275 NW2d 511 (1979); *Womack v Buchhorn*, 384 Mich 718; 187 NW2d 218 (1971), with *Dolby v State Highway Comm'r*, 283 Mich 609; 278 NW 694; 117 ALR 538 (1938). See, generally, Calabresi, *A Common Law for the Age of Statutes* (Cambridge, Mass: Harvard Univ Press, 1982); Wellington, *The Nature of Judicial Review*, 91 Yale L J 486 (1982); Komesar, *In Search of a General Approach to Legal Analysis: A Comparative Institutional Alternative*, 79 Mich L Rev 1350 (1981).

It has yet to be shown that the lakes, rivers, and
streams heretofore opened to the public are not
adequate to meet public needs.[29] Nor is there evi-
dence that a recreational-boating test would signif-
icantly increase the recreational opportunities of
those who are unable to use the present water-
ways. The number of private waters which the
recreational-boating test would make available,
and whether those waters would become accessible
to many persons now inadequately served, is un-
known.[30]

The argument based on public need assumes
that recreational values should be given para-
mount consideration and makes no attempt to
consider competing public values. Recreational use

[29] A review of cases from other jurisdictions indicates that the log-
flotation test, as applied in Michigan, permits greater public access to
recreational waters than in most other states. That Michigan is
among the more liberal states in permitting public access appears
from the reliance that other jurisdictions place on our cases in their
decisions permitting public access in their own waters. See, *e.g.*,
*People ex rel Baker v Mack,* 19 Cal App 3d 1040; 97 Cal Rptr 448
(1971); *State v Korrer,* 127 Minn 60; 148 NW 617; 148 NW 1095
(1914); *Elder v Delcour,* 364 Mo 835; 269 SW2d 17 (1954); *Muench v
Public Service Comm,* 261 Wis 492; 53 NW2d 514; 55 NW2d 40 (1952);
*Day v Armstrong,* 362 P2d 137 (Wy, 1961).

Michigan is blessed with far more inland water than most states, as
well as access to the Great Lakes. One must question whether there is
an overriding need justifying adoption of a new test of navigability.

No facts have been set forth in the record, the briefs, or in the
dissenting opinion regarding the extent of recreational waters already
available to the public, the number of people currently using these
resources, the burden placed on the available waters by those using
them, the number of formerly private waters which would become
public under a recreational-boating test, the extent the public will
benefit from adopting a new rule, and the ecological effect of opening
these small, formerly private waters and their surroundings to the
public.

[30] In *Nicholas,* the several waterways are surrounded by land owned
by the contending parties and others. Application of the recreational-
boating test will not open up these waterways to public use. Unless
licenses are granted to the public, it will simply convey what amounts
to a joint tenancy to private landowners who already have access to
one lake and no demonstrated need for access to another.

has a cost. The inland waters aid the nesting of wildfowl and the propagation of aquatic life.[31] An expansion of public use would also affect the communities where the waters are located.

The importance that society attaches to the various public values, like the importance that society attaches to the need for expanded recreational uses, cannot be gauged by this Court with accuracy. A convincing demonstration has yet to be made that the recreational-boating test implements a widely shared public value that should predominate over competing public values. An enduring consensus has not emerged favoring the proposed course of action:

"As law embodies beliefs that have triumphed in the battle of ideas and then have translated themselves into action, while there still is doubt, while opposite convictions still keep a battle-front against each other, the time for law has not come; the notion destined to prevail is not yet entitled to the field." Holmes, "Law and the Court", in *Collected Legal Papers*, pp 294-295 (1920).

### B

Our attention has been directed to "growing numbers of states"[32] that have reportedly adopted a recreational-boating test.

Some of the decisions cited as adopting this test allow evidence of suitability for recreational boating to be considered together with other evidence in deciding whether a waterway is fit for commercial use, and cannot properly be read as holding

---

[31] See *In re Martiny Lakes Project*, 381 Mich 180; 160 NW2d 909 (1968).

[32] *Post*, p 111.

. that waterways fit solely for recreational use will be deemed navigable.[33]

A number of the decisions neither refer to the recreational-boating test directly, nor can one infer from reading the opinions that it has been applied *sub silentio* to produce findings of navigability.[34]

The case most frequently cited as authority for the recreational-boating test, *Lamprey v State,* 52 Minn 181; 53 NW 1139 (1893), endorses the test in dictum; and subsequent Minnesota decisions have taken pains to point out that this dictum has no precedential value.[35]

Six states have adopted the recreational-boating test directly or de facto. In three, the recreational-boating test is not so much an outgrowth of com-

[33] See *State v Twiford,* 136 NC 603; 48 SE 586 (1904); *Fairchild v Kraemer,* 11 AD2d 232; 204 NYS2d 823 (1960); *St Lawrence Shores, Inc v State,* 60 Misc 2d 74; 302 NYS2d 606 (1969).

[34] See *Elder v Delcour,* 364 Mo 835; 269 SW2d 17 (1954) (river had been used in the past to transport logs); *Curry v Hill,* 460 P2d 933 (Okla, 1969) (river 150 to 200 feet wide and had been used to float logs); *Willow River Club v Wade,* 100 Wis 86; 76 NW 273 (1898) (river 200 feet wide and 8 to 10 feet deep).

[35] See *State v Adams,* 251 Minn 521, 557; 89 NW2d 661 (1957); *State v Bollenbach,* 241 Minn 103, 118; 63 NW2d 278 (1954).

In *Lamprey,* pp 198, 200, the Court held that where a meandered lake is non-navigable in fact the patentee bordering it takes to the center of the lake; whereas, if the lake is navigable in fact the riparian owner only takes to the water's edge, but has a right to all lands accreted or revealed by reliction. Thus, the private owner owned the bed in question.

Acknowledging that it had said what was "sufficient for the purposes of the present case", the Court went on to discuss the concept of navigability in broad terms, in essence stating that all inland lakes in Minnesota capable of any beneficial public use would be considered navigable "so long as these lakes are capable of use for boating, even for pleasure".

Although the discussion of the right to public access in *Lamprey* was dictum, a number of courts have relied on passages from *Lamprey* to justify either their adoption of a more liberal rule of public access or their own dicta. Indeed, we find that in one of the two jurisdictions where appellate courts have explicitly adopted a recreational-boating test the initial case so holding relied in part on *Lamprey,* and the second jurisdiction subsequently relied in part on the first.

mon-law method as it is of either a constitutional
or statutory commitment to public access to inland
waters.[36]

Turning to the three states that have adopted a
recreational-boating test as a matter of judicial
decision,[37] we note that the test has not been
applied to provide the public with access to nar-
row, shallow streams, themselves unfit for mean-
ingful recreation.[38] The stated purpose of the recre-

---

[36] See *Luscher v Reynolds,* 153 Or 625; 56 P2d 1158 (1936) (decision
rested on state constitution's "commerce clause"); *Muench v Public
Service Comm,* 261 Wis 492; 53 NW2d 514; 55 NW2d 40 (1952) (water
power law held to require all waters "navigable in fact for any
purpose whatsoever" be free of private obstruction); *Diana Shooting
Club v Husting,* 156 Wis 261; 145 NW 816 (1914) (legislative enact-
ment declares particular waterway in dispute navigable); *Day v
Armstrong,* 362 P2d 137 (Wy, 1961) (state constitution makes all
inland waters property of the state).

[37] See *Southern Idaho Fish & Game Ass'n v Picabo Livestock, Inc,*
96 Idaho 360; 528 P2d 1295 (1974); *Mentor Harbor Yachting Club v
Mentor Lagoons, Inc,* 170 Ohio St 193; 163 NE2d 373 (1959); *Coleman
v Schaeffer,* 163 Ohio St 202; 126 NE2d 444 (1955); *People v Sweetser,*
72 Cal App 3d 278; 140 Cal Rptr 82 (1977); *Hitchings v Del Rio Woods
Recreation & Park Dist,* 55 Cal App 3d 560; 127 Cal Rptr 830 (1976);
*People ex rel Baker v Mack,* 19 Cal App 3d 1040; 97 Cal Rptr 448
(1971).

[38] In the Idaho case, the river declared navigable was "renowned as
one of the best fly fishing streams in the United States". *Southern
Idaho Fish & Game Ass'n v Picabo Livestock, Inc,* 96 Idaho 360; 528
P2d 1295 (1974).

In the two Ohio cases, the rivers found navigable both flowed into
Lake Erie and were capable of carrying boats of considerable size.
*Mentor Harbor Yachting Club v Mentor Lagoons, Inc,* 170 Ohio St
193; 163 NE2d 373 (1959); *Coleman v Schaeffer,* 163 Ohio St 202; 126
NE2d 444 (1955). Indeed, *Coleman,* pp 204-205, distinguished an
earlier case which held non-navigable two "shallow streams having a
varying depth of but two tenths of a foot in some places" because
such streams unlike the one in the present case were "hardly naviga-
ble water".

The three California appellate decisions concerned the following
waterways:

1) A river that had been used to float logs in the past which varied
in width from 107 feet to 292 feet and varied in depth from 2.7 feet to
17 feet. *People v Sweetser,* 72 Cal App 3d 278; 140 Cal Rptr 82 (1977).

2) An 11-mile portion of a river navigated during nine months of
the year by "small flat-bottomed power boats, rowboats, kayaks and
canoes". *Hitchings v Del Rio Woods Recreation & Park Dist,* 55 Cal
App 3d 560; 127 Cal Rptr 830 (1976).

ational-boating test is to identify waterways fit for recreational use.[39]

The creeks connecting Linton and Big Chub Lakes and Dogfish and Burgess Lakes are narrow and shallow. At many spots, less water is to be found than in a bathtub. They are narrow, and pleasure boats can be steered through them only with difficulty. While there are those who would like to use these creeks to reach Linton or Dogfish Lakes, the creeks are not themselves suitable for recreational canoeing or boating.

### C

Even were it granted that a need for expanded public recreational uses is a value that has hardened into social consensus, we cannot ignore the conflict with another well-recognized norm, the unfairness of eliminating a property right without compensation.

This Court has previously declared that stare decisis is to be strictly observed where past deci-

---

3) A river that according to uncontradicted testimony was usable for pleasure boating the entire year around. *People ex rel Baker v Mack,* 19 Cal App 3d 1040; 97 Cal Rptr 448 (1978).

In *Mack,* a California Court of Appeals declared that the public has a right of access and may exercise the incidents of navigation on any waters capable of being navigated by oar- or motor-propelled small craft. The river in *Mack* had been used to float logs and was a large river, varying in width from 107 feet to 292 feet and varying in depth from 2.7 feet to 17 feet. Certainly, under Michigan law the river would have been held navigable.

[39] Flotation was evidence of fitness for commercial use but was not dispositive. It was not enough to float a ship or a log. Rather, it was necessary to show that once afloat the ship or log could be put to valuable commercial use:

"It is not * * * every small creek, in which a fishing skiff or gunning canoe can be made to float * * *. But in order to * * * give it the character of a navigable stream, * * * it must be generally and commonly useful to some purpose of trade". *Rowe v Granite Bridge Corp,* 38 Mass 344, 347 (1838), quoted approvingly in *In re Martiny Lakes Project,* 381 Mich 180, 194, fn 7; 160 NW2d 909 (1968).

sions establish "rules of property" that induce extensive reliance.[40]

The justification for this rule is not to be found in rigid fidelity to precedent, but conscience. The judiciary must accept responsibility for its actions. Judicial "rules of property" create value, and the passage of time induces a belief in their stability that generates commitments of human energy and capital.

The proposed changes in law would not have a purely theoretical effect. It is said that adoption of the recreational-boating test will respond to the asserted increase in the public's need for access to recreational waters and yet not produce quantitatively different results than the log-flotation test. These two propositions are irreconcilable. If the new test is adopted to meet a need which the former test is not able to satisfy, there necessarily must be some quantitative difference when the two tests are actually applied or there is no need for a new test.

Recreational boats, such as kayaks and canoes, displace far less water than logs, are highly maneuverable, and can travel through waterways unfit for floating logs to market. Michigan is a state of numerous inland waters, many of which are likely to have physical characteristics similar to those of the creeks connecting the lakes in the instant cases. Adoption of a recreational-boating test would subject many formerly private inland waters to what are in essence recreational easements.

Public access to these previously non-navigable waters will diminish enjoyment of surrounding property. Many of those who own such property

---

[40] See *Lewis v Sheldon*, 103 Mich 102; 61 NW 269 (1894); *Hilt v Weber*, 252 Mich 198; 233 NW 159 (1930).

are vacationers who acquired the property for peaceful retreat. A rule which opens these waters to curious boaters and enterprising fishermen may render the property unfit as a refuge or retreat. Even if these interests are thought to be too intangible to warrant protection, it cannot be denied that some landowners have invested their savings or wealth in reliance on a long-established definition of navigability.[41] It also cannot be denied that the heretofore private character of the waters adjacent to their property significantly adds to its market value.

Vacationers are not manufacturers who can pass on their losses to a large class of consumers. Techniques to safeguard past reliance on prior law such as prospective overruling are unavailable where property rights are extinguished. Prevention of this hardship could be avoided through compensation, but this Court has no thought of providing compensation to riparian or littoral owners for the enlarged servitude and the resulting reduction in amenities and economic loss.

Proponents of the recreational-boating test do not deny that its application will inflict loss on riparian or littoral owners. Nor do they deny that this loss may be significant. Instead, it is argued that the preconditions for application of the "rules of property" doctrine are not satisfied.

It is said that Michigan law is not "well-settled" in this area and hence no established property rights are destroyed by a shift to a recreational-boating test. Since *Moore,* the navigational servitude has *only* extended to waters meeting the commercial-shipping or log-flotation tests. The rule of *Winans* has been in force for over 60 years. The

[41] See Waite, *The Dilemma of Water Recreation and a Suggested Solution,* 1958 Wis L Rev 542, 545.

rules enunciated in *Moore* and *Winans* have been applied for over 125 and 60 years, respectively, periods long enough to give rise to a fixed conception of the public's navigational rights.

In stating the log-flotation test of navigability the *Moore* Court did indeed establish a rule of navigability which varied from the English common law and the common law of many jurisdictions in the United States. In doing so, however, the Court was not overruling any binding precedent, for there was none on the issue at that early date in Michigan's history. The Court in *Moore* was writing on a blank slate—we are not.

The argument is made that the present tests for navigability are not "rules of property" on the premise that the Legislature could enact a recreational-boating test without providing compensation. It is contended that there is no "taking" because the riparian or littoral owner would still possess title to the bed of the waterway, albeit qualified by the public's enlarged right to navigate. But this Court has said that "riparian rights are property".[42] The view that riparian rights are property is consistent with this Court's approach to the "taking" question. The presence or absence of title

[42] *Hilt v Weber,* 252 Mich 198, 225; 233 NW 159 (1930).

In *Kaiser Aetna v United States,* 444 US 164, 179-180; 100 S Ct 383; 62 L Ed 2d 332 (1979), where it was held that the federal navigational servitude did not extend to a formerly land-locked Hawaiian marina connected to the Pacific Ocean by an artificial, man-made channel, and where the United States Supreme Court concluded that the government must pay compensation before the public could be granted access to defendant's land, the Court said:

"In this case, we hold that the 'right to exclude', so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation. This is not a case in which the Government is exercising its regulatory power in a manner that will cause an insubstantial devaluation of petitioners' private property; rather the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina."

has not been dispositive. Compensation has been awarded where there has been a significant reduction in the use and enjoyment of property stemming from governmental action.[43] The recreational-boating test would deny riparian and littoral owners the right to exclude others, a right inherent in the concept of private property.[44] The

---

[43] This Court has construed the "taking" clause of the Michigan Constitution to protect property rights. One of the early cases addressing the "taking" question observed:

" 'The constitutional provision is adopted for the protection of and security to the rights of the individual as against the government', and the term 'taking' should not be used in an unreasonable or narrow sense. It should not be limited to the absolute conversion of property, and applied to land only; but it should include cases where the value is destroyed by the action of the government, or serious injury is inflicted to the property itself, or exclusion of the owner from its enjoyment, or from any of the appurtenances thereto." *Pearsall v Eaton County Supervisors*, 74 Mich 558, 561; 42 NW 77 (1889).

This approach to determining whether a "taking" has occurred has been applied by this Court in a variety of circumstances, including elimination of access to property: *Ranson v Sault Ste Marie*, 143 Mich 661; 107 NW 439 (1906); *Morris v Sault Ste Marie*, 143 Mich 672; 107 NW 443 (1906); *Big Rapids v Big Rapids Furniture Mfg Co*, 210 Mich 158, 175; 177 NW 284 (1920); diminution in value caused by an urban renewal project: *In re Urban Renewal, Elmwood Park Project*, 376 Mich 311; 136 NW2d 896 (1965); zoning: *Grand Trunk W R Co v Detroit*, 326 Mich 387; 40 NW2d 195 (1949); *Long v Highland Park*, 329 Mich 146; 45 NW2d 10 (1950); and damage to property caused by a nuisance maintained by the state: *Buckeye Union Fire Ins Co v Michigan*, 383 Mich 630; 178 NW2d 476 (1970).

This Court's decisions, as well as those of other jurisdictions, indicate that a physical intrusion on the property itself is not required for a "taking" to have occurred; see, *e.g.*, *Allen v Detroit*, 167 Mich 464; 133 NW 317 (1911); *Johnstone v Detroit, G H & M R Co*, 245 Mich 65; 222 NW 325 (1928); *Tomazewski v Palmer Bee Co*, 223 Mich 565; 194 NW 571 (1923); *United States v Causby*, 328 US 256; 66 S Ct 1062; 90 L Ed 1206 (1946); *Griggs v Allegheny County*, 369 US 84; 82 S Ct 531; 7 L Ed 2d 585 (1962); and that a reduction in value caused by government action is a strong indication of a "taking". See, *e.g.*, *In re Urban Renewal, Elmwood Park Project, supra; Grand Trunk W R Co v Detroit, supra; Long v Highland Park, supra.*

[44] In responding to an argument that a "taking" had not occurred by use of another's land because the owner retained title, this Court said:

"And among the incidents of property in land, *or anything else,* is not the right to enjoy its beneficial use, *and so far to control it as to exclude others from that use,* the most beneficial, the one most real

"rules of property" doctrine is a judicial rule of fairness, not a clause in the constitution.

The instant cases are said to fall within the exception to the "rules of property" doctrine made by this Court in *Hilt v Weber,* 252 Mich 198; 233 NW 159 (1930), which is read as allowing courts to overrule decisions establishing "rules of property" that themselves disregarded precedent.

This reading of *Hilt* is curious. Far from displaying an insensitivity to those who rely on court-made "rules of property", *Hilt* shows a high degree of concern for protecting long-standing property interests.

In *Hilt,* a recent holding in the *Kavanaugh Cases*[45] that owners adjacent to the Great Lakes hold title to land running along the meander line but not to the waters' edge was re-examined and overruled. The *Hilt* opinion demonstrated at some length that the *Kavanaugh Cases,* decided just two years and seven years earlier, had misanalyzed prior precedent. Especially pertinent is the Court's response to the policy arguments made by those who favored retention of the disputed land for the public:

"The doctrine of *stare decisis* has been invoked. The point has much force. Titles should be secure and property rights stable. Because a judicial decision may apply to past as well as to future titles and convey-ances, a change in a rule of property is to be avoided and practicable idea of property, of which it is a much greater wrong to deprive a man, than the mere abstract idea of property without incidents? The use, or the right to control it with reference to its use, constitutes, in fact, all that is beneficial in ownership, except the right to dispose of it; and this latter right or incident would be rendered barren and worthless, stripped of the right to the use." (Emphasis supplied.) *Grand Rapids Booming Co v Jarvis,* 30 Mich 308, 320-321 (1874).

[45] *Kavanaugh v Rabior,* 222 Mich 68; 192 NW 623 (1923), and *Kavanaugh v Baird,* 241 Mich 240; 217 NW 2 (1928).

where fairly possible. But where it clearly appears that a decision, especially a recent one, was wrong and continuing injustice results from it, the duty of the court to correct the error is plain. The *Kavanaugh Cases* were decided in the recent years in 1923 and 1928, respectively. They enumerated principles at variance with settled authority in this State and elsewhere, under which real estate transactions long had been conducted and given legal effect by courts and citizens, and themselves, disregarded the doctrine of *stare decisis* by overruling the *Warner Case [People v Warner,* 116 Mich 228; 74 NW 705], decided in 1898. The rules they stated are not as old as the rules they abrogated. *When to that are added the considerations that they operated to take the title of private persons to land and transfer it to the State, without just compensation, and the rules here announced do no more than return to the private owners the land which is theirs, the doctrine of stare decisis must give way to the duty to no longer perpetuate error and injustice." Hilt,* p 223. (Emphasis supplied.)

As here, the state invoked the recreational needs of the public, arguing that they outweighed the property loss mistakenly inflicted by the *Kavanaugh Cases.* The Court responded:

"With much vigor and some temperature, the loss to the State of financial and recreational benefit has been urged as a reason for sustaining the *Kavanaugh* doctrine. It is pointed out that public control of the lake shores is necessary to insure opportunity for pleasure and health of the citizens in vacation time, to work out the definite program to attract tourists begun by the State and promising financial gain to its residents, and to conserve natural advantages for coming generations. The movement is most laudable and its benefits most desirable. The State should provide proper parks and playgrounds and camping sites and other instrumentalities for its citizens to enjoy the benefits of nature. But to do this, the State has authority to acquire land by gift, negotiation, or, if necessary, condemnation. There

is no duty, power, or function of the State, whatever its claimed or real benefits, which will justify it in taking private property without compensation. The State must be honest." *Hilt*, p 224.

The Court's experience following the *Kavanaugh Cases* suggests that we should not casually enlarge the rights of the public at the expense of property owners who have relied on prior decisions of this Court. The *Kavanaugh Cases* were overruled because, among other things, they worked severe injustice and constituted a judicial "taking" without compensation.

In *Hilt*, this Court squarely confronted the question of the relative priority that should be given to claims of public recreational need and to claims that existing property rights should not be taken without compensation, and re-established prior precedent protective of long-standing property rights.

## D

Adjudication without an evidentiary record provides no assurance that the information needed for a wise decision will surface or that the relative strength of competing societal values can be accurately measured. The Legislature has the resources to make a comprehensive inquiry into the public's need for increased water recreation and the effect of a change in the law on existing property rights. As a majoritarian body, the Legislature can provide a forum that will attract those affected and, without fearing a loss of legitimacy, proceed to take the measure of their convictions.

The obligation to pay compensation to owners for a governmental taking will discipline legislative inquiry by assuring that the loss inflicted on private parties will be considered, and that recre-

ational access will be granted only if indeed highly prized. That obligation will further assure that those whose property is seized will receive fair treatment. Providing compensation will also vindicate riparian or littoral owner reliance on this Court's past decisions.[46]

Finally, legislative consideration allows a solution capable of responding to a broader range of public needs and one far more sensitive to the dislocation of private interests. A recreational-boating test would operate indiscriminately in waters both fit and unfit for recreational use. The Legislature can exercise its powers selectively, it can identify those waters most suited for recreational use, including lakes that do not have inlets or outlets,[47] and avoid unnecessary seizures. This will not only increase the likelihood of successfully meeting the public need, but prevent gratuitous economic loss.

---

[46] In the combined cases of *Gion v Santa Cruz* and *Dietz v King*, 2 Cal 3d 29; 84 Cal Rptr 162; 465 P2d 50 (1970), the Supreme Court of California recognized a doctrine of implied dedication which permitted the conversion of private beaches into public recreational areas.

One commentator who investigated the aftermath of the 1970 implied-dedication cases found that owners had "rushed to install barbed wire fences and hire guards" to protect their beach areas, and that some owners had even dynamited trails leading to their beaches. See O'Flaherty, *This Land Is My Land: The Doctrine of Implied Dedication and Its Application to California Beaches,* 44 S Cal L Rev 1092, 1095 (1971).

[47] The public would, under the recreational-boating test, gain entrance to a small private lake if any recreational boat could float through an inlet or an outlet leading to that lake. Larger lakes totally surrounded by private land and more suitable for recreational use would remain closed.

Once one accepts the concept that public need for increased access to inland lakes justifies judicial intervention, it will be difficult to distinguish between lakes with navigable inlets and outlets and those entirely surrounded by private land. If a court may use its decretal power to create what are in essence recreational easements over navigable inlets and outlets, it can also create recreational easements over dry land. An easement over a thin strip of land may not work any greater hardship than one over a shallow waterway of similar width.

A judicial recreational-boating test would increase the utilization of the inland waters and do nothing to protect them. Many of Michigan's lakes are in wilderness areas, and enlarged public access might destroy their scenic beauty. Other lakes might be so attractive that they would be overutilized.[48]

## IV

Faced with an uncertain societal consensus, an inability to compensate riparian owners for the loss of a valuable right, and the need for a comprehensive legislative solution, we believe that this Court is not an appropriate forum for resolving the competing societal values which underlie this controversy.

We affirm in *Bott* and reverse in *Nicholas*.

FITZGERALD, C.J., and KAVANAGH and COLEMAN, JJ., concurred with LEVIN, J.

WILLIAMS and RYAN, JJ. This opinion was written by Justice BLAIR MOODY, JR., prior to his death on November 26, 1982. We concur in this opinion and adopt it as our own.

These cases, consolidated for purposes of argu-

---

[48] At least one commentator has voiced opposition to any judicial attempt to fashion a solution to these problems through redefining the concept of navigability. See Bartke, *Navigability in Michigan in Retrospect and Prospect,* 16 Wayne L Rev 409, 450-451 (1970).

"It is becoming increasingly obvious to the public at large that the country faces grave problems in the management of water resources. The time available to correct various abuses of the past is getting shorter and shorter. Something has to be done and it has to be done in a hurry. *To do the job, new and imaginative legal tools are necessary and they will not be fashioned by attempted redefinitions of the concept of navigability. Such attempts are doomed to failure in the long run because they are trying to solve new problems with concepts and tools developed in an entirely different context."* (Emphasis supplied.)

ment and decision, present broad issues for resolution concerning the test of navigability and the scope of permitted public uses of our inland lakes and streams.

In the *Bott* case, a declaratory judgment and a permanent injunction entered on January 25, 1977, in response to Mr. Bott's motion for partial summary judgment under GCR 1963, 117.2(3). The judgment declared a lake situated on Mr. Bott's land to be a private body of water from which the public could be excluded. On December 28, 1977, the Court of Appeals affirmed. This Court granted leave to appeal and directed the parties to include among the issues to be briefed:

"[W]hether Linton Lake is a private inland lake?" 406 Mich 1006 (1979).

In the *Nicholas* case, following a two-day bench trial and the filing of a written opinion, a declaratory judgment and a permanent injunction entered on December 12, 1977. The judgment declared a creek running through land owned by William Nicholas to be a navigable stream. A bridge obstructing passage on the stream was ordered removed and further obstructions were enjoined. By opinion dated January 16, 1979, the Court of Appeals affirmed the trial court's judgment. 88 Mich App 120; 276 NW2d 538 (1979).

This Court granted leave to appeal and directed the parties to include among the issues to be briefed:

"1. [W]hat is the legal test and measure of whether a body of water is 'navigable' so as to impose a public trust on such body, and

"2. [D]id the Court of Appeals properly determine

that Burgess Creek was 'navigable'?" 406 Mich 1007 (1979).

## FACTS

*Bott*

John Bott is the owner in fee of 800 acres of land located in Otsego County, Michigan, which he maintains as a vacation place. Entirely within his property is a body of water known as Linton Lake which is approximately 35 acres in size. Linton Lake has no inlet, being spring-fed, but has an outlet connecting it to Big Chub Lake. Big Chub Lake is approximately 75 acres in size and has numerous riparian owners and a public access site.[1] As well as encompassing Linton Lake, Mr. Bott's property surrounds both sides of the outlet. His property line extends beyond the outlet into Big Chub Lake making him a riparian owner on Big Chub Lake.

The present controversy arose shortly after Mr. Bott purchased the property and was informed by local authorities that the public's access to Linton Lake could not be blocked. Thereafter, Bott filed suit seeking a declaratory judgment that Linton Lake and its outlet connecting it to Big Chub Lake were non-navigable, private bodies of water from which the public could be excluded.

Bott filed a motion seeking summary judgment. An affidavit filed in response to Bott's motion indicated that the outlet is a natural channel 240 feet in length varying in width from 100 feet at its widest point to 15 feet at its narrowest point. The

---

[1] It is unclear from the record how many persons own property fronting on Big Chub Lake or whether there are any inlets or outlets connecting Big Chub Lake to watercourses other than Linton Lake.

depth of the water is approximately 2 feet except
for one point where it is 8 inches deep.[2] Another
affidavit indicated that the outlet is boatable by
small oar- and motor-propelled craft without mak-
ing contact with the banks or bed of the channel.[3]
Partial summary judgment was granted in favor of
appellee Bott under GCR 1963, 117.2(3). The order
of the trial court declared Linton Lake to be a
private, non-navigable body of water from which
the public could be excluded. Further, the judg-
ment expressed no opinion as to the navigability of
Linton Lake's outlet.

*Nicholas*

William and Caroline Nicholas are owners in fee
of approximately 120 acres of land located in
Montcalm County, Michigan, which they maintain
as a vacation place. The Nicholas property sur-
rounds both sides of Burgess Creek, the navigabil-
ity of which is disputed. Burgess Creek lies upon a
watercourse involving several bodies of water.

At one end of the watercourse lies Burgess Lake,
a body of water approximately 60 acres in size
which has 50 riparian owners and no public access
site. The lake has no inlet, being spring-fed, but
has an outlet which is Burgess Creek. The creek is
a natural watercourse approximately 800 feet
long. From bank to bank, the creek varies in width
from 12-1/2 feet at its narrowest point to over 80

[2] These figures concerning the physical dimensions of the outlet
stream were contained in an affidavit prepared by Alfred McCann, a
registered land surveyor employed by the Department of Natural
Resources (DNR) as Supervisor of Surveys in the Engineering Divi-
sion. The figures are the result of a survey he conducted of the
channel in November, 1975.

[3] This affidavit was prepared by David Haywood, employed as
Assistant Chief of the Submerged Lands Management Division of
DNR. The affidavit was a result of Haywood's personally navigating
the outlet channel in a small boat in September, 1975.

feet at its widest point. Located at the creek's widest point is a bog which borders an open channel of water 7-1/2 feet in width. The creek has a silty or soft bed and its depth varies from a maximum of 15 inches to a minimum depth at one point of 6 inches. The average depth of the stream appears to be from 8 to 10 inches.[4]

Burgess Creek empties into a 35-acre body of water known as Dogfish or Pine Lake. Dogfish Lake has an outlet, referred to as Dogfish Creek, which flows into a 3- to 5-acre pond called Salt Springs or Mill Pond. The outlet from this pond eventually flows past a waterwheel, through a culvert under Baker Road and into Wabash Creek and Morgan Lake.[5]

The Nicholas property includes land fronting on Burgess Lake and the land through which Burgess Creek flows. Their land also includes 7/8 of the property surrounding Dogfish Lake and the land on both sides of Dogfish Creek to a point approximately halfway between Dogfish Lake and Mill Pond.

Mr. and Mrs. Nicholas purchased the property in 1959 or 1960 and built a cottage on Burgess Lake. In the fall of 1970, Mr. Nicholas constructed a footbridge spanning Burgess Creek at a point close to where Burgess Lake flows into Burgess Creek. The bridge lies 6 inches above the water and effectively obstructs passage on the stream by

---

[4] Evidence offered concerning the exact physical dimensions of Burgess Creek consisted of an exhibit showing the results of a survey of the creek. The survey was conducted in May, 1977 by Alfred McCann and two assistants, all employees of the DNR. Mr. McCann testified extensively concerning how the survey was conducted and about the physical characteristics of the stream.

[5] Where the watercourse ultimately ends is disputed.

small craft, although evidence was introduced which showed that some people continued to use the stream by pulling a boat over the bridge.

On August 1, 1975, Mr. and Mrs. Nicholas filed suit against appellees McDaniel and Rademacher alleging trespass by appellees' children. Mr. and Mrs. Nicholas sought a declaratory judgment that the creek was private and non-navigable and requested a restraining order preventing further passage on the stream.

On October 14, 1975, the State of Michigan, through its Department of Natural Resources (DNR), filed suit against Mr. and Mrs. Nicholas. DNR sought a declaratory judgment that Burgess Creek was navigable and thus open for passage by the public, including riparians on Burgess Lake. DNR requested removal of the bridge and an injunction restraining further obstructions of the stream by Nicholas.[6]

A trial was conducted and testimony was heard from numerous witnesses concerning the dimensions and navigability of Burgess Creek. The testimony of *all* witnesses indicated that one could traverse Burgess Creek from Burgess Lake to Dogfish Lake by small boat—either in a rowboat propelled by motor or oars, or in a canoe propelled by paddles.

The testimony indicated that small boats had

---

[6] Initially, the DNR in its complaint and appellees McDaniel and Rademacher in their counter-complaint requested relief under the Inland Lakes and Streams Act of 1972. MCL 281.951-281.965; MSA 11.475(1)-11.475(15).

This request for relief was withdrawn prior to declaratory judgment and injunction was then premised solely upon the common-law right of the public to traverse navigable inland streams.

traversed Burgess Creek since the early 1950's up
to the time of trial. Most of the witnesses testified
to having traversed the creek only as far as
Dogfish Lake. Others stated they traveled as far
as the culvert located under Baker Road. One
witness testified to making a trip to Morgan Lake.
Most witnesses testified to making an average of
one to three trips per summer through the creek.

The point which divided the witnesses was the
ease or difficulty with which the creek could be
navigated by small craft. Appellant Nicholas and
his witnesses testified that boaters had to push and
pole their way through the stream.[7] Other wit-
nesses testified that a boat could be freely floated
on the creek except for a point close to the en-
trance of the creek where navigation around a log
and under low-lying branches was necessary. Some
witnesses stated that at another point halfway
down the stream they had to push or pull their
boats over a large log submerged in the water.
Others testified to floating, paddling, and motoring
parts of the stream without making contact with
the banks or bed of the stream.

---

[7] In the suit filed by Mr. and Mrs. Nicholas, claim was made that
appellees McDaniel and Rademacher had committed various tres-
passes. The trial court made no findings as to these allegations. A
review of the evidence indicates as follows:

Mr. Nicholas described incidents where he had encountered tres-
passers on his property on Dogfish Lake but these persons gained
entrance to the property in motor vehicles over a private road. As to
trespasses in the creek area, Mr. Nicholas did testify to a rowboat
abandoned in the mud near the bridge which he claimed belonged to
children of appellees McDaniel or Rademacher. He also testified that
trees had been cut and brush cleared out in Burgess Creek near its
exit from Burgess Lake. No witnesses claimed to have seen anyone
cut the trees although Nicholas testified that during a heated discus-
sion one of the appellees admitted to cutting some trees. Nicholas
testified that an abutting landowner *could* have cut some of the
trees. Conversely, a DNR employee conducting a survey of the creek
testified to seeing trees felled *across* the creek which looked like they
had been sawed and thus were not naturally felled.

The trial court weighed the conflicting evidence
and found that the creek could be traversed freely
by boats and canoes propelled by oar or paddles
and in some portions by motors. The judge found
the creek to be navigable based on its being boata-
ble. The court also found the entire watercourse
extending from Burgess Lake to the culvert under
Baker Road to be navigable by small craft. The
bridge was ordered removed and further obstruc-
tions enjoined.

## DISCUSSION

Both cases squarely present the issue of what
the test is for determining the navigability of our
inland waterways so as to impress such waters
with the public trust. Resolution of this question is
to be found through close examination of case law.

### I

Some early English jurists believed that only
those waters affected by the ebb and flow of the
tide were navigable. In such waters the public
presumptively had rights of navigation and fish-
ing. It was thought that these public rights at-
tached because the crown held title to the beds of
all tidal waters "in trust" for the public. Waters
affected by the ebb and flow of the tide, including
the sea and salt-water inland rivers, were consid-
ered "navigable in law".

As the common law developed, inland rivers not
affected by the tide were labeled "navigable in
fact". A public right of navigation was also recog-
nized upon these waters despite the fact that title
to the bed of such rivers was held by private
persons who owned land adjacent to the rivers.

This occurred as the English courts realized that development of the country's commerce depended upon use of these rivers which were in fact capable of being navigated by vessels engaged in commerce.

This "true" English rule, recognizing that navigable waters may include those not affected by the tides, was stated by Sir Matthew Hale in his treatise De Jure Maris as follows:

" 'Fresh rivers, in point of propriety, are prima facie of a private interest; yet they may be under these two servitudes,—one of prerogative, belonging to the King, and another of public interest or belonging to the public in general. * * * The King by ancient right of prerogative hath had a certain interest in fresh rivers; (1) a right of franchise or privilege that no man shall set up a common ferry for all passengers; (2) an interest of pleasure or recreation,—as, the right of fowling or fishing in it; (3) an interest of jurisdiction, which extends to reformation and punishment of nuisances in all rivers that are of common passage, not only for ships and greater vessels, but also for smaller, as barges and boats, *for as the common highways on the land are for the common passage, so this kind of rivers, whether fresh or salt, that bear boats or barges, are highways by water; and as the highways by land are called altae viae regiae, so these public rivers for public passage are called fluvii regales and haut streames le roy, not in reference to the propriety of the river, but to the public use.* And therefore the report of Sir John Davies in the *Royal Fisheries of the Banne* mistakes the reason of those books that call these streames le roy, as if they were so called in respect of propriety, for they are called so because they are of public use and under the King's special care and protection, whether the soil be his or not. * * * [T]here be some streams or rivers that are private, not only in propriety or ownership, but also in use,—as, little streams and rivers that are not a

common passage for the King's people. * * * *[T]here be other rivers, as well fresh as salt, that are of common or public use for carriage of boats and lighters. And these, whether they are fresh or salt, whether they flow and reflow or not, are prima facie publici juris common highways for man or goods, or both, from one inland town to another.* Thus, the rivers of Wey, of Severn, of Thames, and divers others, as well above the bridges and ports as below, as well above the flowing of the sea as below, and as well where they are become to be of private propriety as in what parts they are of the King's propriety, are public rivers juris publici.'" (Emphasis changed.) 1 Farnham, The Law of Waters and Water Rights, § 23e, p 113.

Therefore, as the common law developed, the public's right to navigate upon waters capable of supporting transportation by the public was recognized without regard to whether title to the bed was held by the crown or by private persons.[8]

## II

In the United States the courts largely rejected the line of early English cases confining the concept of navigability to those waters touched by the ebb and flow of the tide. The approach adopted was that if water was navigable in fact it was considered navigable in law.

The test for navigability commonly referred to as the "federal test" adopted this approach. This rule evolved in litigation concerning the extent of Congress's power under the Commerce Clause to develop, improve, and generally regulate interstate

---

[8] In accordance with this view see *Lorman v Benson,* 8 Mich 18; 77 Am Dec 435 (1860).

Development of English common-law concepts of navigability is discussed in more detail in 1 Farnham, The Law of Waters and Water Rights, §§ 23a-23e, pp 104-117; Gould, The Law of Waters (3d ed), §§ 42-53, pp 100-118; 4 Clark, ed, Waters and Water Rights, ch 16; Harnsberger, *Eminent Domain and Water,* §§ 305-305.1, pp 97-108.

waterways. It was set forth in *The Daniel Ball,* 77 US (10 Wall) 557, 563; 19 L Ed 999 (1870), as follows:

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. *And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water* * * *,* when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." (Emphasis added.)

Another federal test, whether regarded as separate and distinct from the federal "navigable in fact" test, or as an extension of the "navigable in fact" test, is the federal test of "navigable capacity". In *United States v Appalachian Electric Power Co,* 311 US 377, 407; 61 S Ct 291; 85 L Ed 243 (1940), the Court held that waterways not navigable in their natural state, but capable of being made navigable after reasonable improvements, are also considered navigable interstate waterways subject to federal control.

The federal tests of navigability reflect adoption of the common-law "navigable in fact" test in varied forms in the context of determining the outer perimeters of the federal government's power to regulate interstate waterways.[9]

---

[9] See, also, dissenting opinion of Justice Blackmun in *Kaiser Aetna v United States,* 444 US 164, 182-183; 100 S Ct 383, 394; 62 L Ed 2d 332 (1979), where he discusses the earliest federal test of navigability, "ebb and flow of the tide", and states that this test has continued viability.

The test of navigability for determining federal admiralty jurisdiction is very similar. See 1 Clark, ed, Waters and Water Rights, ch 3;

### III

Upon admission to the Union, the courts of each state were free to adopt or reject the English common-law doctrines in determining navigability of waters located within the state's boundaries. Further, each state was free and remains free to fashion tests of navigability which are less restrictive than the federal test for determining public use of waters so long as these tests do not conflict with the paramount federal control over "interstate waterways" lying within the state.[10]

The courts in Michigan have utilized the com-

Stone, *Public Rights in Water Uses and Private Rights in Land Adjacent to Water,* § 37.2(A), pp 204-205.

For discussion of how the federal test of navigability has been expansively applied to permit federal regulation of interstate waterways, see Water Resources and the Law (University of Michigan Law School, 1958); Lauer, *The Riparian Right as Property,* pp 234-247; 4 Clark, ed, Waters and Water Rights, ch 16; Harnsberger, *Eminent Domain and Water,* §§ 305.2-305.6, pp 109-149.

[10] "[F]ederal definitions are controlling when applicable to the context of the problem at hand, and the federal government retains paramount control over waters navigable under the commerce clause definition. However, *in all other respects, the states are free to prescribe their own definitions of navigability, and, when not in conflict with federal dominion, 'the exclusive control of waters is vested in the state, whether the waters are deemed navigable in the Federal sense or in any other sense.' [Day v Armstrong,* 362 P2d 137, 143 (Wy, 1961); *Marks v Whitney,* 6 Cal 3d 251, 260; 98 Cal Rptr 790; 491 P2d 374 (1971); *Colberg, Inc v State ex rel Dep't of Public Works,* 67 Cal 2d 408, 416-417; 62 Cal Rptr 401; 432 P2d 3 (1967), *cert den* 390 US 949; 88 S Ct 1037; 19 L Ed 2d 1139 (1968).]

"Thus, for purposes of public use of waters, *the state may adopt different and less stringent tests of navigability. [Fox River Paper Co v Railroad Comm of Wisconsin,* 274 US 651, 655; 47 S Ct 669; 71 L Ed 1279 (1927); *Brewer-Elliott Oil & Gas Co v United States,* 260 US 77, 89; 43 S Ct 60; 67 L Ed 140 (1922); *Wear v Kansas ex rel Brewster,* 245 US 154, 158; 38 S Ct 55; 62 L Ed 214 (1917); *Donnelly v United States,* 228 US 243, 262; 33 S Ct 449; 57 L Ed 820 (1913); *Southern Idaho Fish & Game Ass'n v Picabo Livestock, Inc,* 96 Idaho 360; 528 P2d 1295 (1974); *State v Bunkowski,* 88 Nev 623, 628; 503 P2d 1231, 1234 (1972); 1 Clark, Waters and Water Rights, § 37.4(A), pp 212-213.] Even for bed title questions, where there is no conflict with a federal grant the states need not use a federal definition. *[Brewer Oil Co v United States, supra,* 260 US 89.] Moreover, navigability for purposes of a public navigational easement need not be evaluated as of the date of statehood; it may later arise. *[Bohn v Albertson,* 107 Cal

mon-law "navigable in fact" test, similar to the federal test, in determining the navigability of some Michigan waters. Under this test, waters navigable in fact by large vessels engaged in commerce are navigable in law. *Collins v Gerhardt,* 237 Mich 38, 43; 211 NW 115 (1926); *Shepard v Gates,* 50 Mich 495, 497; 15 NW 878 (1883). The courts have applied the test to certain waterways in determining the respective rights of the public and abutting riparian landowners. Those waterways within the state which are capable of supporting large vessels engaged in commerce have been referred to in Michigan as "strictly navigable".

However, early in the jurisprudence of the state, this Court rejected the English common-law or federal tests as the *sole* bases for determining navigability and public uses of our inland lakes and streams. *Moore v Sanborne,* 2 Mich 519; 59 Am Dec 209 (1853). In *Moore,* the Court held that inland waterways capable of floating logs or timber were navigable even when the water's capacity to float logs was not continuous. Waters of the state capable of supporting such public uses came to be known as "qualifiedly navigable".

Distinctions between waterways strictly navigable and those qualifiedly navigable have always been recognized. Bartke, *Navigability in Michigan in Retrospect and Prospect,* 16 Wayne L Rev 409 (1970). Many of the distinctions drawn between strictly navigable waters and qualifiedly navigable waters initially arose from consideration of whether title to the bed of the waterway was held by the state or by private persons.

App 2d 738, 742-743; 238 P2d 128 (1951).]" (Emphasis added.) *Hitchings v Del Rio Woods Recreation & Park Dist,* 55 Cal App 3d 560, 567-568; 127 Cal Rptr 830 (1976).

See also Dunscombe, Riparian and Littoral Rights (New York: The William-Frederick Press, 1970), p 66.

Upon admission to the Union, the State of Michigan took title to the beds of all navigable waters within its boundaries. *Nedtweg v Wallace,* 237 Mich 14, 16; 208 NW 51; 211 NW 647 (1927).[11] The state chose to retain title to the beds of the Great Lakes and of Lake St. Clair.[12] The state's title to the beds of the Great Lakes was determined to be a title held in trust for the public. In the landmark case of *Illinois Central R Co v Illinois,* 146 US 387, 452; 13 S Ct 110; 36 L Ed 1018 (1892), the United States Supreme Court opined that the State of Illinois held title to the bed of Lake Michigan

"in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties."

As applied to the Great Lakes the public trust concept was adopted early in this state's jurisprudence and has been adhered to throughout the years.[13] Today, it is unquestioned that the public

[11] While some courts have held that the states took title to the beds of all navigable waters within their borders at the time the states were admitted to the Union, other courts have held that a state's title to navigable waters within its boundaries vested at the time the original 13 colonies gained independence. See Water Resources and the Law (University of Michigan Law School, 1958); Lauer, *The Riparian Right as Property,* p 231; 1 Clark, ed, Waters and Water Rights, ch 3; Stone, *Public Rights in Water Uses and Private Rights in Land Adjacent to Water,* § 36.4, pp 194-195.

[12] Title to the bed of Lake St. Clair passed to the state upon admission to the Union and is impressed with the public trust. *State v Venice of America Land Co,* 160 Mich 680, 701-702; 125 NW 770 (1910).

[13] For cases containing discussion of the extent to which the state may grant rights to private persons to use the beds of the Great Lakes within the strictures of the public trust doctrine see: *Obrecht v National Gypsum Co,* 361 Mich 399; 105 NW2d 143 (1960); *Nedtweg v Wallace,* 237 Mich 14; 208 NW 51, 211 NW 647 (1927); *State v Venice of America Land Co,* 160 Mich 680; 125 NW 770 (1910); *State v Lake St Clair Fishing & Shooting Club,* 127 Mich 580; 87 NW 117 (1901).

may use these waters for navigation, fishing, and recreational activities.

In contrast, title to the beds of all Michigan inland waterways other than the Great Lakes and Lake St. Clair was placed in the riparian owner of the land adjacent to the water.[14] Great resistance was offered by these landowners to recognition of any public right to use waters adjacent to their lands. Riparians claimed that since they held title to the beds of these waterways they should have exclusive control of the water abutting their lands, including exclusive rights of fishing and hunting.

These claims were largely rejected by the courts in Michigan.[15] The title held by private persons to

Discussion of the public trust doctrine as it relates to water as well as other natural resources may be found in Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention,* 68 Mich L Rev 473 (1970).

[14] In *Lorman v Benson,* 8 Mich 18; 77 Am Dec 435 (1860), title to the beds of all waters other than the Great Lakes was declared to be in the riparian or abutting landowners.

The owner of land adjacent to a stream takes title to the thread or center of the stream bed. *Collins v Gerhardt,* 237 Mich 38, 47; 211 NW 115 (1926); *Johnson v Burghorn,* 212 Mich 19, 27; 179 NW 225 (1920); *A M Campau Realty Co v Detroit,* 162 Mich 243, 245; 127 NW 365 (1910); *Lorman v Benson,* 8 Mich 18; 77 Am Dec 435 (1860).

The owner of land abutting inland lakes other than the Great Lakes takes title to the center of the lake bed. *Hall v Wantz,* 336 Mich 112, 116; 57 NW2d 462 (1953); *Bauman v Barendregt,* 251 Mich 67, 70; 231 NW 70 (1930).

[15] The public's right to fish in navigable waters has always been protected by the courts either as incident to the public's navigational right or as an independent right.

In *Lincoln v Davis,* 53 Mich 375; 19 NW 103 (1884), this Court rejected adoption of the English common-law rule that a riparian owner had exclusive fishing rights in waters adjacent to his land so long as the waters were not affected by the ebb and flow of the tide. The Court held that the right to fish in the Great Lakes was a right shared in common by all the public. The right of the public to fish in the Great Lakes was reaffirmed in *State v Lake St Clair Fishing & Shooting Club,* 127 Mich 580; 87 NW 117 (1901), and *State v Venice of America Land Co,* 160 Mich 680, 702; 125 NW 770 (1910).

The right of the public to fish in waters determined to be qualifiedly navigable is now beyond question. *Kerley v Wolfe,* 349 Mich 350, 356; 84 NW2d 748 (1957) (lake); *Attorney General ex rel Director of*

the beds of "strictly navigable" waters, capable of supporting large vessels engaged in commerce, was early declared to be a qualified title subject to the public's right of navigation. On waters considered "strictly navigable", the public's right of navigation was held "paramount". *People's Ice Co v The Steamer "Excelsior"*, 44 Mich 229, 234; 6 NW 636 (1880).

Eventually, title held by private persons to the beds of waters deemed navigable under the *Moore* decision was also determined to be a qualified title subject to public uses of the waters. However, in contrast to the rights of the public upon "strictly navigable" waterways, the respective rights of the public and of riparian landowners to use qualifiedly navigable waters were considered to be more equal in stature. As stated by Justice COOLEY in his concurring opinion in *White River Log & Booming Co v Nelson*, 45 Mich 578, 583-584; 8 NW 587, 909 (1881):

---

*Conservation v Taggart,* 306 Mich 432; 11 NW2d 193 (1943) (river); *Collins v Gerhardt,* 237 Mich 38; 211 NW 115 (1926) (river).

In Michigan the right of the public to fish in navigable waters has been codified by legislative enactment:

"[I]n any of the navigable or meandered waters of this state where fish have been or hereafter may be propagated, planted or spread at the expense of the people of this state or the United States, the people shall have the right to catch fish with hook and line during such seasons and in such waters as are not otherwise prohibited by the laws of this state." MCL 307.41; MSA 13.1681.

The general rule followed by a majority of states is that once a stream or lake is determined to be navigable the public may fish upon it. See Anno: *Right of public to fish in stream notwithstanding objection by riparian owner,* 47 ALR2d 381, 385-389.

Early Michigan decisions treated the question of whether the public had the right to hunt and trap upon navigable waters differently from the question of the right of the public to fish. The riparian owner has been held to have the exclusive right to hunt. *Sterling v Jackson,* 69 Mich 488; 37 NW 845 (1888); *St Helen Shooting Club v Mogle,* 234 Mich 60, 64-65; 207 NW 915 (1926). The riparian owner of land adjacent to a navigable stream may also exclude the public from placing traps upon the stream bed. *Johnson v Burghorn,* 212 Mich 19; 179 NW 225 (1920).

"The rights of the public to run logs in the stream are not subordinate to those of the owner of the bank, but they are concurrent, and each must be enjoyed reasonably, and without any unnecessary interference with the enjoyment of the other, and without negligence. But this is all that can be required. No man can be punished in damages for an enjoyment of his undoubted rights, when he acts reasonably and with prudence."

Recognition of the competing uses to which the public and riparian owners wished to subject these lakes and streams resulted in judicial balancing and harmonizing of the respective rights of both groups.[16]

---

[16] Through litigation, rules were developed defining the scope of permissible public uses of the waters of qualifiedly navigable lakes and streams. These public rights were balanced against the rights of riparian landowners to use the beds and banks of such streams.

This Court sought to protect the riparian's right to enjoy the ordinary flow of waters past his premises and held in a line of cases that the right of the public to use the streams could not be aided by artificial means (such as dams) nor could the public unduly interfere with the natural flow of the stream. See, *e.g., Koopman v Blodgett,* 70 Mich 610; 38 NW 649 (1888); *Buchanan v The Grand River & Greenville Log Running Co,* 48 Mich 364, 366-367; 12 NW 490 (1882); *Thunder Bay River Booming Co v Speechly,* 31 Mich 336; 18 Am Rep 184 (1875); *Middleton v Flat River Booming Co,* 27 Mich 533, 535-536 (1873).

Further refinement of the scope of the public's navigational right on qualifiedly navigable waters developed under trespass theories. While the riparian owner does not "own" the water flowing past his land, he holds title to the dry or fast land abutting the water and holds a qualified title to the bed of a navigable waterway.

Members of the public who used the stream and caused the stream to overflow and flood the fast lands of a riparian landowner were held liable to the riparian for damages for trespass. *The Grand Rapids Booming Co v Jarvis,* 30 Mich 308 (1874).

Other cases involved alleged trespasses on the bed of waterways where a person stopped and anchored in the water. The rule developed that where title to the bed of water was held by a private riparian owner, a person exercising the right of navigation may anchor temporarily but cannot do so permanently. *Hall v Wantz,* 336 Mich 112; 57 NW2d 462 (1953). See, also, *McCardel v Smolen,* 404 Mich 89, 96; 273 NW2d 3 (1978), where this Court recently stated that where lawful access is gained to a navigable lake, members of the public may use the waters for "bathing, swimming and temporarily anchoring boats".

Finally, in response to a claim that the right of fishing could be exercised by a riparian landowner to the exclusion of the public this Court strongly reaffirmed the right of the public to use waters deemed "qualifiedly navigable". In *Collins v Gerhardt,* 237 Mich 38, 47-49; 211 NW 115 (1926), the Court held that these waters were also impressed with the public trust, stating:

"Now, it being the fact that the State of Michigan acquired title to all of the beds of its navigable waters in perpetual trust for the preservation of the public right of navigation, fishing, etc., and Pine river being navigable, how has it come about that the plaintiff, as riparian owner, has secured a title unimpressed with this trust? The answer is that he has no such title. If he has derived his title by purchase and grant from the State, he has taken it subject to the same trust with which it was impressed while vested in the State. If he derived it by patent from the United States, he took it subject to a like trust. Neither the United States nor the State of Michigan could divest itself of this trust. As was said in *Nedtweg v Wallace, supra:*

" 'There has arisen, out of centuries of effort, limitation of crown prerogative, parliamentary action, numerous adjudications, common necessity, and public forethought, a rule beyond question, impressing rights of the public upon all navigable waters. * * * The State may not, by grant, surrender such public rights any

---

Since the public's navigational right only extends to the high-water mark of a stream or lake, the cases are legion that the public has no right to trespass on the banks or fast lands of the riparian owner in order to gain access to the water. See, *e.g., Collins v Gerhardt,* 237 Mich 38, 49; 211 NW 115 (1926) (river); *Douglas v Bergland,* 216 Mich 380, 383-384; 185 NW 819 (1921) (lake); Anno: *Rights, privileges, or easements of public, its grantees or licensees, on land bordering on navigable water,* 53 ALR 1191.

Conversely, a riparian owner may not build a structure on the bed of a qualified navigable stream if the structure unduly interferes with or hampers exercise of the public's navigational right. Whether there is undue interference is a question of fact for the jury. *Ryan v Brown,* 18 Mich 196, 209; 100 Am Dec 154 (1869).

more than it can abdicate the police power or other essential power of government.'

"It is not necessary to cite other authorities to show that this trust cannot be abrogated or surrendered. Our own court has so held.

"While the United States held title to the Northwest Territory its policy was to leave the matter of fixing the rights of riparian owners to the future States. For 23 years after its admission to Statehood, Michigan adhered to the policy of retaining title to the beds of its Great Lakes and navigable rivers, and it has never by grant or legislative enactment changed that policy. It still owns the soil under the waters of the Great Lakes, but, by judicial decision in 1860, the title to the beds of navigable rivers was declared to be in the riparian owners. It was then that Justice Campbell wrote *Lorman v Benson,* 8 Mich 18; 77 Am Dec 435 [1860]. He seems to have considered it the wiser policy to place the title of the soil under navigable rivers in the riparian proprietors. This policy from long acquiescence has become a rule of property, so that it is now settled in this State that a conveyance of land adjoining a navigable river carries title to the center of the stream. But, *though the court declared the title to be in the riparian owner, it could not divest the State of its trustee capacity, and did not undertake to do so. The title allowed to be taken by the riparian owners was subordinate to the public rights, including the public right of fishing.* It was so held in *McMorran Milling Co v C H Little Co,* 201 Mich 301 [167 NW 990 (1918)], where it was said:

" 'It is true that the State might either by legislative enactment or judicial decision as has been done in this State, retain title to the bed of the Great Lakes and surrender such title in the riparian owner upon streams; but such title in the hands of either the State or riparian owner was still burdened with the trust.'

"From this it follows that the common-law doctrine, *viz.,* that the right of fishing in navigable waters follows the ownership of the soil, does not prevail in this State. *It is immaterial who owns the soil in our navigable rivers. The trust remains. From the beginning the title was impressed with this trust for the preservation of*

the public right of fishing and other public rights,
which all citizens enjoyed in tidal waters under the
common law.

\* \* \*

"So long as water flows and fish swim in Pine river,
the people may fish at their pleasure in any part of the
stream subject only to the restraints and regulations
imposed by the State. In this right they are protected
by a high, solemn and perpetual trust, which it is the
duty of the State to forever maintain."[17] (Emphasis
changed.)

Therefore, in Michigan the fact that title to the
bed of an inland waterway is in private hands has
never been held to thwart recognition of the right
of the public to use waters determined to be navi-
gable under common-law standards.

### IV

In the 1853 seminal case of *Moore, supra,* this
Court not only rejected the common-law rule re-
stricting navigability to those waters capable of
supporting large vessels engaged in commerce as
the sole test, but it also rejected rigid application
of precedent which was non-responsive to the pub-
lic's need for use of the waterways at that time. In

---

[17] See also *Kerley v Wolfe,* 349 Mich 350; 84 NW2d 748 (1957),
where the Court stated that although title to the bed of an inland
*lake* was held by the abutting riparian owner, such title was im-
pressed with the public trust. Relying on *Collins,* the Court opined:

"*Collins,* a leading case, settles the disputed question of navigability
and status adversely to these defendants. It sustains application of
the theory that defendants' title to the subaqueous land in question is
impressed with the public trust Justices McDONALD and FELLOWS
considered at length in respective concurring opinions (see pages 45,
46, 47, 48, 55 and 56 of *Collins'* report). So long as boatable waters
stand or flow in the upper reaches of this inland lake, people having
lawful access to such waters may boat upon and fish in the same,
provided they trespass not on fast and privately held lands." *Kerley,*
356.

See also *Attorney General ex rel Director of Conservation v Tag-
gart,* 306 Mich 432, 440; 11 NW2d 193 (1943).

adopting the rule that waterways capable of floating logs to market fell within the category of navigable streams, the Court stated its rationale as follows:

"The servitude of the public interest depends rather upon the purpose for which the public requires the use of its streams, than upon any particular mode of use— and hence, in a region where the principal business is lumbering, or the pursuit of any particular branch of manufacturing or trade, the public claim to a right of passage along its streams must depend upon their capacity for the use to which they can be made subservient." *Moore,* 525.

The concept of navigability announced in *Moore* represented a pragmatic judicial response in recognition of the public need for use of inland waters as it existed at that time. The public need for certain uses and not the narrow manner or mode of use was the animating principle of the Court's decision.

For many years the log flotation test served as a practical and fair measure of whether our inland lakes and streams should be considered navigable and open for public use. During years when Michigan waters were actually used for floating logs to market, utilization of this test made sense.

The log flotation test remained the standard for adjudicating navigability of inland lakes and streams long after most waterways had ceased to be used for transporting lumber. However, application of the test changed as the public's required uses of these waters evolved from commercial to recreational in nature.

Under the test announced in *Moore,* water could be considered navigable if it had even occasional *capacity* to float logs. At the time the *Moore*

decision was announced actual use of water for floating timbers was one way of indicating the water's capacity to support such a use. As public uses of streams and lakes changed, the manner of proving capacity was necessarily altered.

Since our waters had not been used for logging in most areas for many decades, no evidence of actual use of lakes and streams for logging could be presented. Generally, some testimony would be offered concerning a prior history of logging on the waterway with greater emphasis placed upon other factors such as the physical dimensions of the waterway and its capability of supporting current public uses. Adjudications as to navigability began to emphasize current public uses of lakes and streams as these were evolved from commercial to recreational in nature.[18]

The rulings in the cases of *Collins v Gerhardt, supra,* and *Attorney General ex rel Director of Conservation v Taggart,* 306 Mich 432; 11 NW2d 193 (1943), reflect recognition of current public uses of our waterways and thus constitute judicial reaffirmation of principles first set forth in the *Moore* case.

In *Collins,* this Court held that *all* navigable inland waters, including those qualifiedly navigable, "are protected by a *high, solemn* and *perpetual* trust, which it is the duty of the State to forever maintain". *Collins,* 49. Public activities protected by the trust were held to include the recreational activity of fishing. Although the Court ostensibly applied the log floating capacity test in making a determination of navigability, the Court's ruling was obviously motivated by the

---

[18] See *Kerley v Wolfe,* 349 Mich 350; 84 NW2d 748 (1957); *Attorney General ex rel Director of Conservation v Taggart,* 306 Mich 432; 11 NW2d 193 (1943); *Collins v Gerhardt,* 237 Mich 38; 211 NW 115 (1926).

public's need for use of the stream for recreational purposes. Nearly 20 years later in *Attorney General v Taggart, supra,* the Court upheld a determination of navigability as to a stream averaging one foot in depth and used by the public primarily for fishing. In *Taggart,* the Court reaffirmed the sound policy of the *Collins* decision, stating:

"[T]he public interest came to depend rather upon the required use of the stream than upon any previous particular mode of use. * * * While the *Sanborne Case [Moore]* only disposed of the right of floatage and did not decide that a floatable stream has the status of waters navigable for all purposes, *the public character of water was held to be determined by reference to the public necessity for its use.* It is this broad underlying principle rather than the narrow rule of the *Sanborne Case* which was in effect adopted by the court in *Collins v Gerhardt, supra,* when it held that floatability determined the public character of a stream and affixed therein the public right of fishing. Whatever criticism may be made of the *Collins Case* because of its lack of authority, we believe it states sound law and a public policy appropriate to the character of this State." (Emphasis added.) *Taggart, supra,* 441-442.

The log flotation test has long outlived its usefulness. Continued application of this test ignores the *Moore* Court's rationale that concepts of navigability must be fashioned in response to the public's required uses of waterways. Over time the public's required use of inland waters has changed from logging and commercial travel to recreational activities.[19] The log flotation test constitutes no

[19] The late Justice THOMAS M. KAVANAGH recognized this in his dissent to *In re Martiny Lakes Project,* 381 Mich 180, 212; 160 NW2d 909 (1968), where he stated:

"The basic public purpose for which our lakes and streams are used in this day and age clearly are not commercial in the sense that commerce is strictly defined. Commercial travel by boats and canoes is obsolete and other modes of transportation are now in vogue for

meaningful measure of whether a waterway is navigable and thus open to the public for recreational as well as commercial uses.

Furthermore, the log flotation test has become impractical as a means of determining navigability. Where judicial adjudications of navigability are requested, the issue of whether a particular waterway is navigable is one of fact to be decided by the trier of fact. *Moore, supra,* 528; 1 Farnham, The Law of Waters and Water Rights, § 26, p 124. Soon there will be no living witnesses available to testify as to whether any particular lake or stream has ever been used for logging purposes. The trier of fact will be deprived of any probative evidence of logging history to assist in making a determination as to navigability of a waterway.

The following statement, made by the Court of Appeals in *Attorney General ex rel Director of the Dep't of Natural Resources v Hallden,* 51 Mich App 176, 187-188; 214 NW2d 856 (1974), is persuasive:

"Stare decisis is a vital general principle of the common law, but not a requirement that precedent rendered meaningless by a century of change be followed without thought. The strength of the common-law tradition lies less in our willingness to repeat what has been said before than in our duty to insure that the law reflects the needs and values of the society it is designed to serve. Time and change have rendered the log floating test of navigability an anachronism."

Blind adherence to precedent by rote application of the log flotation test ignores the reality of

economic reasons of cost, time, and facility of travel. Wholesale movement of logs via floating on lakes and streams is also obsolete and has been for so long that it is difficult to locate persons who have first-hand knowledge of whether logs were *ever* floated down a particular stream to the great lumber mills of the late 1800's."

current conditions and needs of the public. Accordingly, we reject continued adherence to the log flotation test as a suitable standard for modern determinations of navigability of inland waterways.

## V

A test which fairly balances the rights of the public and of those persons owning property adjacent to water is the recreational boating test. Under this test if waters are capable of being navigated by small craft propelled by oar, paddle, or motor, the water is navigable and open to the public for navigation, fishing, and recreational use.

This test is consonant with the concept of navigability. Further, it is a test which recognizes the public's current need for use of our waterways and is thus consistent with the rationale of the *Moore, Collins,* and *Taggart* decisions.

Waterways capable of supporting navigation by small recreational craft are large enough to justify judicial recognition of a valid public need for use and enjoyment of the water and application of the public trust. Additionally, the recreational boating test does not differ much in any quantitative sense from the log flotation test as it has been applied in the past. Also, whether water is boatable by small craft has been considered a pertinent factor in many cases where the navigability of inland lakes has been adjudicated.[20]

Finally, the recreational boating test is a pragmatic approach. Under this test factual determinations of navigability and the capacity of a waterway to support small recreational craft can be

---

[20] See, *e.g., Pigorsh v Fahner,* 386 Mich 508, 527; 194 NW2d 343 (1972) (BRENNAN, J., *dissenting); Kerley v Wolfe,* 349 Mich 350, 356; 84 NW2d 748 (1957); *Cole v Dooley,* 137 Mich 419; 100 NW 561 (1904).

aided by reference to actual use of the water for boating.

In accordance with the principle first set forth in *Moore* that concepts of navigability and public access should be fashioned in response to current public needs for use of our waterways and motivated by pragmatic concerns, we join the growing numbers of states that have adopted the recreational boating test.[21] We therefore hold that wa-

---

[21] A growing number of states have adopted either the recreational boating test or the recreational use test as the more modern and practical standard for determining navigability of inland lakes and streams open for public uses. Of course, statutory and constitutional provisions pertinent to questions concerning ownership of land underlying inland waters and public uses of waterways differ from state to state. However, many of the courts adopting either of these tests based their holdings entirely or largely upon common-law analyses. *Included* among states adopting these tests are the following:

The recreational boating test was adopted in California in *People ex rel Baker v Mack,* 19 Cal App 3d 1040, 1050; 97 Cal Rptr 448 (1971), where the court held:

"[M]embers of the public have the right to navigate and to exercise the incidents of navigation in a lawful manner at any point below high water mark on waters of this state which are capable of being navigated by oar or motor-propelled small craft."

Accord: *People v Sweetser,* 72 Cal App 3d 278; 140 Cal Rptr 82 (1977); *Hitchings v Del Rio Woods Recreation & Park Dist,* 55 Cal App 3d 560; 127 Cal Rptr 830 (1976).

Idaho deems waters navigable and open for use by the public where the water is capable of floating logs *or* of being navigated by small recreational craft. *Southern Idaho Fish & Game Ass'n v Picabo Livestock, Inc,* 96 Idaho 360, 362-363; 528 P2d 1295 (1974).

In Minnesota, the recreational boating/recreational use test was first set forth in the landmark case of *Lamprey v State,* 52 Minn 181, 199-200; 53 NW 1139 (1893), where the court opined:

"[W]e do not see why boating or sailing for pleasure should not be considered navigation, as well as boating for mere pecuniary profit.

"Many, if not the most, of the meandered lakes of this state, are not adapted to, and probably will never be used to any great extent for, commercial navigation; but they are used * * * by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes which cannot now be enumerated or even anticipated. To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated.

* * *

"[S]o long as these lakes are capable of use for boating, even for pleasure, they are navigable, within the reason and spirit of the common-law rule."

Accord: *State v Korrer*, 127 Minn 60, 63; 148 NW 617 (1914).

In Ohio the recreational boating test was approved in *Mentor Harbor Yachting Club v Mentor Lagoons, Inc*, 170 Ohio St 193; 163 NE2d 373 (1959). Relying upon the earlier case of *Coleman v Schaeffer*, 163 Ohio St 202; 126 NE2d 444 (1955), the *Mentor* court stated:

"[T]his court has extended the criteria for determining navigability beyond the so-called 'commercial usage' test * * *. To decide navigability solely upon the basis of such use fails to take cognizance of the tremendous increase in the public use of waterways. * * * We are in accord with the modern view that navigation for pleasure and recreation is as important in the eyes of the law as navigation for a commercial purpose." *Mentor, supra*, 199-200.

Accord: *State ex rel Brown v Newport Concrete Co*, 44 Ohio App 2d 121; 336 NE2d 453 (1975).

Wisconsin courts have adopted a recreational boating test for determining navigability. Prior to any significant statutory pronouncements regarding public use of waters, common-law concepts of navigability evolved from standards dealing with log floating to those concerned with pleasure boating. A good explanation of the development of Wisconsin case law concerning navigability can be found in *Muench v Public Service Comm*, 261 Wis 492, 499-506; 53 NW2d 514, 55 NW2d 40 (1952). See also *Diana Shooting Club v Husting*, 156 Wis 261; 145 NW 816 (1914), and *Willow River Club v Wade*, 100 Wis 86; 76 NW 273 (1898).

In Wyoming, although streams may be held non-navigable for purposes of determining that title to the stream bed is held by the abutting riparian owner, if the water is capable of floating timber or small craft the public has a right to navigate the water in craft and fish and hunt from their boats. *Day v Armstrong*, 362 P2d 137, 146-147 (Wy, 1961).

In Missouri and Oklahoma, courts have held streams non-navigable for purposes of determining that the abutting riparian held title to the bed of the streams. However, boatability by small craft and current uses of the stream by the public were considered pertinent factors in declaring the water available for public uses such as boating and fishing. *Elder v Delcour*, 364 Mo 835; 269 SW2d 17 (1954); *Curry v Hill*, 460 P2d 933 (Okla, 1969).

In Oregon the court held a lake non-navigable for purposes of determining that title to the lake bed was held by a riparian landowner. However, the court broadly construed the term "commerce" to include pleasure boating and held the water open for public use in *Luscher v Reynolds*, 153 Or 625, 634-636; 56 P2d 1158 (1936).

Cases in other states, which ostensibly apply the "federal test" of navigability, have relied almost entirely upon the fact that the water is actually navigated by recreational craft to show the water's "capacity" for commercial navigational use under the federal test. See, *e.g.*, *St Lawrence Shores, Inc v State*, 60 Misc 2d 74, 78; 302 NYS2d 606

ters capable of being navigated by oar-, paddle-, or motor-propelled small craft are navigable. So long as access to such waters may be obtained without trespassing upon private property, the public may boat, fish, and exercise other lawful incidents of navigation on these waters up to the high-water mark.[22]

## VI

Appellee Bott contends that prior cases have utilized a test to determine the navigability of inland lakes which is somewhat different from tests employed to determine the navigability of inland streams and rivers. In certain circumstances, lakes have been adjudicated private and non-navigable as a matter of law for purposes of determining whether use by the general public is permissible.

Thus, the *Bott* case presents the additional issue whether Linton Lake is a private lake from which the public may be excluded. The judgment entered by the trial court declared that the lake was private without determining whether the lake's outlet was navigable or non-navigable.

Appellee Bott contends that the test to deter-

(1969); *Fairchild v Kraemer*, 11 AD2d 232, 235; 204 NYS2d 823 (1960); *People v Kraemer*, 7 Misc 2d 373; 164 NYS2d 423 (1957); *State v Twiford*, 136 NC 603, 608-609; 48 SE 586 (1904).

[22] Our decision is limited to determining the right of the public to use waterways deemed navigable under common-law standards. We acknowledge but need not address the regulatory authority of the Legislature, under its police power, to make reasonable regulations concerning the use and preservation of waters that may not be deemed navigable under common-law analyses, such as laws concerning flood control, wetland preservation, and watershed development.

In the federal system, congressional authority to regulate waters under the Commerce Clause has been held not to depend upon the water being considered navigable. *Kaiser Aetna v United States*, 444 US 164, 173-174; 100 S Ct 383, 389; 62 L Ed 2d 332 (1979). See also *United States v Appalachian Electric Power Co*, 311 US 377; 61 S Ct 291; 85 L Ed 243 (1940).

mine whether an inland lake is considered private is whether a lake is entirely surrounded by the upland or dry land of a single owner regardless of whether the lake or the lake's inlet or outlet is navigable in fact. Bott argues that since he owns all the land surrounding Linton Lake and its outlet to Big Chub Lake, Linton Lake is a private, non-navigable body of water, from which the public may be excluded. Conversely, the Attorney General contends that "private" inland lakes are limited to those lakes having no navigable inlet *or* outlet entirely surrounded by the upland of a single riparian owner.

A review of Michigan case law reveals some inconsistency in the manner in which this Court has resolved the issue of whether a lake was private and not available for use by the public.

*Giddings v Rogalewski,* 192 Mich 319; 158 NW 951 (1916), is the earliest case in which a riparian owner of land on a natural inland lake challenged the right of the public to use the lake. *Giddings* involved a person who trespassed over privately owned land to fish from the banks of a lake. The lake was approximately 20 to 25 acres in size, *with no inlet or outlet,* and was completely surrounded by land owned by a single person.

The *Giddings* Court rejected the argument that the lake should be considered a public lake because the lake was boatable and because fish could pass in and out of the lake through a subterranean channel. In holding that this lake was private, the Court opined:

"The true test [of navigability] is whether the waters under consideration are capable of being used by the public as thoroughfares or highways for purposes of commerce, trade, and travel—of affording a common passage for transportation and travel by the usual and

ordinary modes of navigation. *Moore v Sanborne,* 2 Mich 519; 59 Am Dec 209 [1853]; *Tyler v People,* 8 Mich 320 [1860]; *Baldwin v [Erie] Shooting Club,* 127 Mich 659; 87 NW 59 [1901]. *This small, unmeandered, comparatively shallow and disconnected sheet of water, entirely surrounded by the single farm of a private owner, and which can only be reached by invading private premises, does not possess these essential attributes. The public right of access to such waters at some point is manifestly an important if not determinative, factor in the law of navigability.* It is difficult to conceive of a highway beginning, extending its whole length, and ending in the interior of the private estate of a single owner." (Emphasis added.) *Giddings,* 324-325.

The Court emphasized the important role that lawful access plays in determining whether water is navigable and available to the public for fishing, by stating:

*"The right of the people to fish in navigable or meandered waters* where fish are propagated, planted, or spread, and *to which they have lawful access by land or water,* even though such waters may superimpose the subaqueous lands of a private owner, *is not decided nor involved here."* (Emphasis added.) *Giddings,* 325.

*Giddings* was followed by the case of *Winans v Willetts,* 197 Mich 512; 163 NW 993 (1917), where a riparian owner who had granted exclusive fishing rights on the lake to a private club sought to enjoin members of the public from fishing upon the lake. The lake was approximately 100 acres in size and had no inlet, being spring-fed. The lake had an outlet stream which the majority stated was navigable by rowboats and which ultimately flowed into Lake Erie. A highway abutted the lake, from which persons could step into the waters of the lake. Other facts are difficult to discern from the opinion including whether Mr. Winans owned

or controlled *all* of the land surrounding and underlying the lake.[23] Further, it is unclear how the defendants in the case gained access to the water.[24]

The presence of an outlet stream and a highway adjoining the lake were noted. However, without any analysis regarding the impact of these differing features from *Giddings,* the Court in conclusory terms simply stated:

"It is plain, however, that the lake is not a public, navigable body of water, and is a privately owned pond. *Giddings v Rogalewski,* 192 Mich 319; 158 NW 951 [1916]." *Winans,* 518.

In a reasoned dissent, written by Justice FELLOWS and concurred in by Chief Justice KUHN, it was concluded that the lake and its outlet were navigable under the *Moore* decision and open to the public:

"I do not conclude from this record, measured by the holdings of this court, that Winans Lake is a non-navigable body of water, or that its outlet is a non-navigable stream. The lake itself covers 100 acres, and is certainly

[23] Apparently, Mr. Winans and his brother held title to a portion of the lake shore and lake bed subject to a dower interest in their mother. Another portion of the lake shore and lake bed was owned by Mr. Hull's estate.

Winans claimed to have leased the land owned by Hull's estate. The majority concluded that Mr. Winans was not the owner or lessee of all the land covered by the lake.

[24] Mr. Winans generally alleged that defendants had trespassed upon his land. The defendants claimed to have entered the water over land owned by Hull's estate with the permission of Hull's heirs.

Without explanation of how in fact the defendants had gained access to the water, the majority declared they were trespassers. Later in the opinion, the majority stated that since Mr. Winans did not appear to own or control all of the land underlying the lake, it was *possible* that members of the public could obtain permission to fish on the lake from other riparian owners. However, it was concluded that such a situation was not presented on the record.

a floatable body of water. Its outlet connecting it with Gut, Zukey, and Strawberry lakes flows into Huron river and Lake Erie. *The fact that this outlet has a capacity sufficiently large to allow small boats to come up stream into Winans lake demonstrates to my mind that it has sufficient capacity to float logs down stream. It therefore has a sufficient capacity, a sufficient capability, to perform a valuable service to the public.* If it has the capability of such valuable use, it is not of importance that it is not now so used. Its capability determines its character and fixes the rights of the parties; its use or nonuse does not change its character. * * *

"The leading case of *Moore v Sanborne,* 2 Mich 519; 59 Am Dec 209 [1853], early laid down the rule in this State which has not been deviated from. It was there said:

" '* * * [I]n nearly all the States this rule has been extended so as to be adapted to the necessities of our trade and commerce, and to embrace all streams upon which in their natural state there is *capacity for valuable floatage,* irrespective of the fact of actual public use, or the extent of such use. * * *'

"*Measured by this standard, and it is the standard used by this court in numerous cases, I think that not only Winans lake, but its outlet, form part of the navigable waters of the State. Sterling v Jackson,* 69 Mich 488; 37 NW 845; 13 Am St Rep 405 [1888], and *Hall v Alford,* 114 Mich 165; 72 NW 137; 38 LRA 205 [1897], are not in point. Both cases involve the right of fowling. *Giddings v Rogalewski,* 192 Mich 319; 158 NW 951 [1916], dealt with a small pond covering only 20 to 25 acres, with no inlet or outlet, entirely surrounded by lands of a single owner." (Emphasis added.) *Winans,* 520-521.

Justice FELLOWS further concluded that since members of the public could obtain access to this navigable lake without trespassing upon privately owned land, the public was entitled to fish on the lake.

The next case presenting the issue of whether a lake was private was *Putnam v Kinney,* 248 Mich 410; 227 NW 741 (1929). The *Putnam* case involved Conover Lake, a body of water approximately 112 acres in size, with *no inlet or outlet.* There was a highway running along a portion of the lake from which the public launched boats. However, all the land surrounding the lake was privately owned by Mr. Putnam and others. A fence was erected at the water's edge near the highway to block access to the lake. Despite the fence, the public continued to enter the lake from the highway. Suit was brought to enjoin the public from entering the lake to fish and to enjoin the operation of a boat livery, presumably on or near the highway. The Court held that the lake was a private body of water, citing *Giddings* and *Winans.*

The most recent case decided by this Court, in which riparian owners on an inland lake challenged the right of the public to use the lake, was *Pigorsh v Fahner,* 386 Mich 508; 194 NW2d 343 (1972). The body of water involved in *Pigorsh* was Wood Lake, approximately 74 acres in size, with *no inlet or outlet.* All the land surrounding the lake was owned by two families. These families erected a fence at the water's edge to prevent the public from entering the water from a private road which terminated at or near the water's edge. The lake, which was presumably boatable, was held to be a private body of water:

"Decisions establishing the 'rule of property' which of right control disposition of this case were gathered in *Putnam v Kinney,* 248 Mich 410 (1929). *Putnam* is 'on all fours' here. These decisions go back to the simple proposition *that one who is owner in fee of all of the upland surrounding one of our wholly private inland lakes, a lake having no navigable inlet and no naviga-*

ble outlet, *(a) really owns the subaqueous land of the lake and the water over the latter as well as the upland, and (b) that his property right is such that he may exclude all others from the lake, the general public included."* (Emphasis changed.) *Pigorsh,* 513-514.

Therefore, as developed in *Pigorsh,* the "wholly private lake" category included only those lakes having no navigable inlets *or* outlets, completely surrounded by the land of "one who is owner in fee". This narrow principle, originally formulated in *Giddings,* was applied. Although such lakes may have sufficient capacity to support navigation by small recreational craft, they are considered private and non-navigable for purposes of determining whether use by the general public is permissible. The owner of all the fast land surrounding a lake which has no navigable inlet or outlet is entitled to exclude all others from using the lake.

In the *Bott* case at bar, the trial court declared Linton Lake to be private, relying upon the Court of Appeals decision in *Michigan Conference Ass'n of Seventh-day Adventists v Comm of . Natural Resources,* 70 Mich App 85; 245 NW2d 412 (1976). *Michigan Conference* involved a dispute between a riparian owner of land upon Shellenbarger Lake and members of the public wishing to use the lake. The lake was a body of water approximately 104 acres in size, with no inlets, but having an outlet creek which eventually flowed into the Au Sable River. The Court of Appeals held the lake to be private, citing *Pigorsh, Putnam,* and *Winans.* Relying primarily on *Winans,* the panel concluded the lake was private regardless of the navigability of the lake's outlet creek.

Upon a review of case law, we are convinced that for purposes of deciding whether the public has the right to use a lake for recreation or

transportation, wholly private lakes are limited to those having no navigable inlet or outlet which are completely surrounded by the land of one who is owner in fee. *Pigorsh, supra.* This conclusion is compelled for a number of reasons.

First, cases which do not address the issue of navigability, but which deal with whether members of the public have access to a lake, reveal there are very few "wholly" private lakes in the sense that a landowner on a lake may exclude all other persons, including the general public, from using the surface of the lake overlying his land. It is now well settled that on a lake having more than one riparian owner, each riparian holds title to different portions of the lake bed, but must share the right to use the *entire surface* of the lake with all other riparians. *Burt v Munger,* 314 Mich 659; 23 NW2d 117 (1946); *Bauman v Barendregt,* 251 Mich 67, 71; 231 NW 70 (1930).

This right to use the entire surface waters has also been extended to members of the public who are licensees of riparians on lakes to which the general public otherwise has no right of access. *Beach v Hayner,* 207 Mich 93, 98; 173 NW 487 (1919); *Snively v Jaber,* 48 Wash 2d 815; 296 P2d 1015 (1956). In *Beach,* the Court noted that under *Giddings* a riparian owner was entitled to exclude *all* members of the public only where the public had not obtained lawful access to the water. Members of the public in *Beach* had otherwise lawful access to the lake since they were licensees of lake riparians. Having obtained lawful access, they were entitled to boat and fish on the lake's surface.

Second, in cases primarily concerned with determining the navigability of inland lakes, whether the public has had lawful access to a lake by land or by water has been an important consideration

in deciding whether the lake is wholly private or navigable and available for use by the public.

In all previous cases where a lake has been held private, it was not found that the public had lawful access to the lake by land. In *Giddings* and *Pigorsh,* the public could gain access to the lake only by trespassing over privately owned land. In *Winans* and *Putnam,* the lakes were held private despite the presence of a highway abutting a portion of the lakeshore. However, these cases failed to discuss the effect of the highway's presence and whether the highway afforded the public lawful access to the lake. Whether the public has lawful access to water from a highway running along a body of water or terminating at the water's edge depends upon the scope of the dedication of the highway to the public. The public's easement along a roadway does not *always* include the right of access to adjoining water. *McCardel v Smolen,* 404 Mich 89, 101; 273 NW2d 3 (1978); *People v Sweetser,* 72 Cal App 3d 278, 283-286; 140 Cal Rptr 82 (1977).[25]

Public access *by water* has been a key consideration in litigation concerning whether a lake is navigable. In framing the rule defining private inland lakes, the Court in *Pigorsh* emphasized that private lakes are limited to those having no navigable inlet and no navigable outlet. *Pigorsh,* 514. In *Putnam* and *Giddings,* where the lakes were held to be private, the Court noted the absence of *any* surface inlet or outlet to the lakes. In *Hall v Wantz,* 336 Mich 112, 113; 57 NW2d 462 (1953), the Court found a lake navigable, noting the pres-

[25] Further discussion of the public's right of access to water from a public highway may be found in: 1 Farnham, The Law of Waters and Water Rights, § 141, pp 654-656; 1 Clark, ed, Waters and Water Rights, ch 3; Stone, *Public Rights in Water Uses and Private Rights in Land Adjacent to Water,* § 38.2(B), pp 227-230.

ence of an outlet. Further, in discussing riparian rights on inland lakes, the *Hall* Court characterized navigable inland lakes as those having inlets and outlets. *Hall,* 117.

The presence of a navigable inlet or outlet to a lake is most important because it indicates that the public has a lawful means of access to the lake. The *Giddings* Court held public access to a lake by land or water to be an important, if not determinative, factor in deciding navigability. *Giddings,* 325. This was also recognized by Justice BRENNAN in his dissent to *Pigorsh,* where he explained:

"Outlet and inlet * * * are very important, at least from the standpoint of an affirmative finding of navigability. If an inland lake has a navigable inlet or outlet, and if the lake itself is passable or boatable, it seems obvious that the lake forms a part of the aquatic highway and is navigable.

* * *

"Mere out and inlet * * * are not important *per se,* in determining navigability. *Navigable inlet and outlet are important, however, because they provide a means of public access to an inland lake."* (Emphasis added.) *Pigorsh,* 524-525.

To the extent that the lake in *Winans* was held private despite the presence of an arguably navigable outlet stream, *Winans* ignored the importance of public access by water in determining the navigability of a lake. In this regard, *Winans* conflicts with earlier and subsequent decisions of this Court, and to the extent it does conflict, *Winans* is overruled.

Finally, construing the "wholly private lake" exception to include only those lakes with no navigable inlet and no navigable outlet is conso-

nant with the recreational boating test as the general test of navigability. If a lake has an inlet or outlet which is capable of supporting navigation by small recreational craft, and if the lake itself is boatable, the public has lawful access to the lake and the right to make reasonable use of the lake's surface.

Acceptance of appellee Bott's position that lakes may be considered wholly private and non-navigable for public use solely because all the land surrounding the lake is owned by a single person, irrespective of the presence of a navigable inlet or outlet, would not only conflict with these principles but also would lead to undesirable results. Although the physical configurations of lakes and streams obviously differ, a lake having both a navigable inlet and a navigable outlet forms as much of a part of an aquatic highway as does a stream. In such situations, lakes are very similar to rivers and streams. If such lakes were held non-navigable as a matter of law, navigation on a waterway consisting of alternating lakes and streams could be blocked at the inlet and outlet of each lake. Ultimately, if the public had no right of entry or exit at points where streams met lakes, navigation upon the entire watercourse could be thwarted.

In addition, private lakes cannot be construed to include those having *either* a navigable inlet *or* a navigable outlet where all the land surrounding the lake is owned by a private person. To do so would ignore the fact that the public has lawful access to the water and would be inconsistent with well-reasoned prior cases on the subject. The situation of a person owning all the land surrounding a lake connected by a navigable stream to other water does not differ much in a qualitative sense

from that of a person owning land on both sides of a navigable stream or river. In both cases the person owns land surrounding the water. In both cases the public has a concurrent right to stop for a while and make reasonable recreational use of the water, including activities such as boating and fishing. To hold that riparian owners on lakes to which the public has access by water may exclude the public, whereas riparians owning stretches of land on navigable streams and rivers may not, unnecessarily and unwisely elevates the status of riparians on lakes over that of riparians on streams and rivers.

Finally, and importantly, we cannot accept appellee Bott's position that one person owning all of the land surrounding a lake having a navigable outlet may exclude the public because this view ignores and would cause an abrogation of the public trust.

Over 50 years ago, our Court in *Collins v Gerhardt,* 237 Mich 38; 211 NW 115 (1926), rededicated itself to the sound principle enunciated long before in *Moore* that navigable waters of this state are protected for public use by a high, solemn, and perpetual trust. The trust is imposed on all waters which are navigable in fact. The *Collins* Court succinctly stated:

"The navigability of a *stream or lake,* however, fixes its public character, that of public water, and the right of fishing in public waters is a public right belonging to the people of the State." (Emphasis added.) *Collins,* 50.

By placing title to the bed of navigable inland waterways in private persons, the state did not and could not abrogate the public trust. It was made clear in *Collins:*

"The State holding these subaqueous lands in its sovereign capacity * * * holds them as trustee for the public and for its use and benefit. * * * The State may surrender the technical fee title to such lands but it can not unshackle them from the trust which continues no matter where the technical fee title may rest." *Id.,* 56.

Nearly 25 years ago our Court specifically recognized that all inland *lakes* containing boatable waters are considered navigable in fact and are impressed with the public trust. *Kerley v Wolfe,* 349 Mich 350, 356; 84 NW2d 748 (1957). The *Kerley* Court further stated:

"So long as boatable waters stand or flow in the upper reaches of this inland lake, people *having lawful access* to such waters may boat upon and fish in the same, provided they trespass not on fast and *privately held lands.*" (Emphasis added.)

Thus it matters not that one may be owner in fee of all the land underlying and surrounding a qualifiedly navigable lake. Title to the land underlying such a lake is impressed with the trust. However, only those members of the public having lawful access to the waters may use the lake pursuant to the trust. Manipulation of the manner in which title to land adjoining lakes or streams is held may not operate to extinguish the trust. Since even the state may not abrogate the trust, it is inconceivable that private persons should be allowed to do so.

One may not trespass on private lands to reach a lake to exercise usage rights. However, if access to a lake may be obtained by use of a navigable inlet, outlet, or both, those members of the public having lawful access to the waterway may also freely boat and fish upon the lake. Whether the

inlet or outlet is navigable will depend upon whether the waters are capable of being navigated by small craft propelled by oar, paddle, or motor.

Accordingly, we hold that lakes which are private for purposes of determining whether public use of the lake surface is permissible are limited to those lakes having no navigable inlet or navigable outlet, completely surrounded by land owned by a private person to which the public has no other ordinary lawful means of access. Since the presence of navigable inlets or outlets provides the public with a lawful means of access to a lake which is navigable in fact, such a lake cannot be determined to be wholly private. The public's right to use inland waters impressed with the trust to which the public has lawful access may not be abrogated.

## VII

Appellee Bott and appellant Nicholas contend that any determination declaring the waterways lying next to their land to be navigable would constitute the abrogation of settled "rules of property". Bott and Nicholas contend further that such a result would constitute a "taking" of property without compensation proscribed by Const 1963, art 10, § 2. With these contentions, we cannot agree.

Rules of property are simply rules which have evolved through case adjudications concerning rights in property. As explained in *Pigorsh, supra:*

" '[C]ourts are not compelled to follow so-called "rules of property", [although] the doctrine of stare decisis is more strictly followed where property rights, especially rights in real property, are concerned and where rights have become vested in reliance on the precedents.' (20 Am Jur 2d, Courts, pp 531, 532.)

"This of course is the Michigan rule. *Lewis v Sheldon,*
103 Mich 102, 103 [61 NW 269] (1894); *Pleasant Lake
Hills Corp v Eppinger,* 235 Mich 174 [209 NW 152]
(1926); *Dolby v State Highway Comm'r,* 283 Mich 609,
615 [278 NW 694] (1938)." *Pigorsh,* 513, fn 1.

The navigability of the specific waterways in-
volved in the present cases is an issue which has
not been resolved in any prior litigation. This is in
contrast to the situation present in *Pleasant Lake
Hills Corp, supra. Pleasant Lake* involved a lake
which had already been adjudicated non-navigable
by this Court in *Winans.* Therefore, the Court in
*Pleasant Lake* felt compelled to adhere strictly to
the doctrine of stare decisis in resolving issues
regarding the lake's navigability. In the present
cases, this Court is not under similar strictures.

As we have discussed, the law in Michigan
regarding navigability has never been particularly
"well-settled" in the sense that no conflict has
existed in prior determinations concerning the
navigability or permissible public uses of our in-
land lakes and streams. Further, in the past, this
Court has not been hesitant to overrule prior cases
dealing with rights in real property where rules
stated were formulated in disregard of other deci-
sions of the Court. *Hilt v Weber,* 252 Mich 198,
223; 233 NW 159 (1930).

Therefore, overruling *Winans* is no departure
from any established rule of property concerning
the navigability of inland lakes. *Winans* was an ill-
conceived decision, containing an inartful and con-
fusing recitation of facts pertinent to decision and
employing little analysis, which reached a result
in conflict with principles set forth in prior as well
as subsequent decisions of this Court. Moreover,
adoption of the recreational boating test as the
general test of navigability is but an extension of

the concept first set forth in *Moore* that determinations as to navigability must reflect prevailing public necessities for use of waterways. Adoption of such a test harmonizes common-law concepts of navigability with current conditions and uses of inland waters.

Likewise, we conclude that the effect of our decisions results in no taking under Const 1963, art 10, § 2. Riparian rights have been regarded as property for the purpose of analyzing whether a taking has occurred under the Michigan Constitution. *Hilt v Weber, supra.* However, no recognized riparian rights are being taken in the sense that the riparian litigants in the instant cases are entitled to compensation.

Recognition of the concurrent right of the public to make reasonable use of the waters of lakes and streams where title to the bed of such waterways is held by private persons does not constitute a taking. In Michigan, title to the beds of waterways deemed navigable under common-law standards has always been held to be a qualified title subject to the right of the public to make certain uses of the waters. Similarly, the California courts have rejected arguments that recognition of public rights to use waterways constitutes a taking where title to the bed of the waterway is held by private persons:

"Respondents have devoted a substantial portion of their argument on appeal to the matter of title to the stream bed, asserting that a finding of navigability will result in a taking of private land. * * * [T]he question of title to the bed of a navigable stream is not raised in this action to determine public use rights, nor is it relevant to the issues herein presented for decision. * * * The ownership of the bed is not determinative of

public navigational rights, nor vice versa."[26] (Citations omitted.) *Hitchings v Del Rio Woods Recreation & Park Dist,* 55 Cal App 3d 560, 571; 127 Cal Rptr 830 (1976).

No other recognized riparian rights are being infringed upon. For example, the riparian's right of access to the water is not threatened. Nor does this decision affect the rights of a riparian owner to enjoy the ordinary flow of water past riparian land and to make reasonable use of the water for domestic or agricultural purposes upon riparian fast land.[27] We conclude that no valid taking argument has been presented.[28]

---

[26] In contrast to a riparian's title to the bed of a navigable waterway which is considered a qualified title, a riparian's title to the dry land adjoining such waters is considered an absolute title. Under our opinion, no appropriation or taking of a riparian's dry land is being made. The public must gain access to navigable water without trespassing upon private property.

[27] Reliance by Bott and Nicholas upon prior Michigan case law is misplaced. In *Bauerle v Charlevoix County Board of Road Comm'rs,* 388 Mich 520; 201 NW2d 799 (1972), the Court held that a taking had occurred where government action resulted in interference with the well-recognized right of a riparian to use the entire surface of a pond or lake. In *Hilt v Weber, supra,* the Court concluded that a taking of dry or fast land had occurred. The title of riparians on the Great Lakes was vested early in the state's history as including all the dry land up to the water's edge. As the lakes receded, additional dry or relicted land became exposed. Prior decisions which placed title to this relicted land in the state were overruled. *Tamulion v State Waterways Comm,* 50 Mich App 60; 212 NW2d 828 (1973), involved a determination that the riparian's right of access to the water had been blocked and that riparian fast land had been taken as a result of state and federal action in constructing a harbor adjacent to the property.

[28] Two recent cases, cited by appellee Bott as supporting his position, do not alter our conclusion. *Kaiser Aetna v United States,* 444 US 164; 100 S Ct 383; 62 L Ed 2d 332 (1979); *Vaughn v Vermilion Corp,* 444 US 206; 100 S Ct 399; 62 L Ed 2d 365 (1979). *Kaiser* involved a situation where a fishing pond was dredged out, converted into a marina and artificially connected at private expense to an ocean bay. The majority held that, following improvements, the marina was part of the navigable waters of the United States for purposes of regulation by Congress. However, the majority would not construe the navigational servitude as extending to permit public access to and use of the marina's waters since it was concluded that public use would constitute an impermissible taking without compen-

## VIII

Finally, we must decide whether the trial courts properly resolved the issue whether the waterways in each case were navigable. In cases where navigability is contested, whether a waterway is navigable is an issue of fact to be decided by the trier of fact. *Moore, supra,* 528; 1 Farnham, The Law of Waters and Water Rights, § 26, p 124. Such factual findings of navigability are affirmed upon review unless the findings are against the manifest weight of evidence. *State ex rel Brown v Newport Concrete Co,* 44 Ohio App 2d 121, 129; 336 NE2d 453, 458 (1975).

In the *Bott* case, the trial court granted partial summary judgment declaring Linton Lake to be a non-navigable private body of water without deciding whether Linton Lake's outlet was navigable. An outlet exists from Linton Lake to Big Chub Lake. If it is determined that this outlet is navigable, then members of the public who have the right to use Big Chub Lake also have lawful access to use the waters of Linton Lake pursuant to the perpetual public trust which remains. On the other hand, if the outlet is found to be non-navigable, then those members of the public who have the right to use Big Chub Lake will have no lawful access to utilize the privileges preserved under the

---

sation. *Vaughn* involved a different situation where it was alleged that natural waterways, forming part of the system of interstate waters, had been destroyed or diverted during the construction of artificial canals. The Court did not decide whether public access should be allowed in these circumstances and remanded the case for further proceedings.

These cases do not alter our conclusion in the present cases. Factors found by the *Kaiser* majority as compelling the result reached included the fact that prior to improvements, under state law, the title to the water of the fish pond was deemed as absolute as the title of an owner of fast or dry land. Further, the Court noted that connection between such water and interstate waterways was accomplished by artificial means and at private expense. These considerations are not present in either of the cases at bar.

trust on Linton Lake. Affidavits offered in opposition to Bott's motion raised a question of material fact as to the navigability of Linton Lake's outlet. Summary judgment was therefore improperly granted under GCR 1963, 117.2(3).

In the *Nicholas* case, the trial judge found Burgess Creek to be navigable. The judge's written opinion contained the following specific findings:

"As to a finding of fact, the court is satisfied that, from all the credible evidence, boats and canoes may traverse and float Burgess Creek being propelled freely by oars and paddles and in some portions by motors.

"The court also finds that a boat or canoe may float and traverse from Dogfish Lake to the Mill Pond on Dogfish Creek and from the Mill Pond on the creek or stream to a culvert on Baker Road with oars or paddles."

The finding that Burgess Creek is navigable is supported by the evidence and is therefore affirmed. Numerous witnesses testified that small boats had traversed the creek for approximately 20 years. The point which divided the witnesses was the ease or difficulty with which boats could travel the creek. The judge weighed the credibility of all witnesses and concluded that boats could freely float on the creek propelled by oars, paddles and in some portions by motors. There is sufficient evidence on the record to sustain this finding.

However, a portion of the declaratory judgment entered in the *Nicholas* case cannot be sustained without clarification. The judgment provides in part:

·"It is further ordered, adjudged and declared that any logs, brush, debris or materials of any kind which are in the water and which presently are obstructing the passage by the public through Burgess Creek, or may at

any future time, by natural or unnatural causes, become located in the water of Burgess Creek, may be cut and/or trimmed and removed by the plaintiffs or by any members of the general public *so as to restore said* Burgess Creek to its status as an unobstructed *navigable stream,* and further, the plaintiffs, William C. Nicholas and Caroline J. Nicholas, their agents and any and all persons otherwise connected with the plaintiffs, and all those in participation who receive actual notice of this injunction, are permanently ordered and restrained from interfering in any manner whatsoever with any members of the public who are engaged in acts of clearing away obstructions to the free passage through Burgess Creek as mentioned previously herein." (Emphasis added.)

Mr. and Mrs. Nicholas contend that this portion of the judgment can be construed as allowing wholesale clearing out of the stream and destruction of trees on their property. We agree that such activity is not permissible and emphasize that the order limits removal of obstructions to achieve the restoration of "Burgess Creek to its status as an unobstructed navigable stream".

Members of the public have a right to make use of the waters of a navigable stream. However, the public is not entitled to "improve" a stream to make it more readily navigable. *Koopman v Blodgett,* 70 Mich 610, 616; 38 NW 649 (1888); *Thunder Bay River Booming Co v Speechly,* 31 Mich 336; 18 Am Rep 184 (1875). No appropriation may be made of the soil, vegetation, or trees located on the banks of the stream. *Wilkinson v Dunkley-Williams Co,* 139 Mich 621; 103 NW 170 (1905). See generally, 1 Farnham, The Law of Waters and Water Rights, § 29a, p 139; Anno: *Rights, privileges, or easements of public, its grantees or licensees, on land bordering on navigable water,* 53 ALR 1191.

Finally, both riparian litigants contend that public use of inland waters necessarily results in noise and water pollution, littering, and trespasses for which riparian landowners have no adequate remedy. We are unpersuaded by these contentions for a number of reasons.

On strictly navigable waters, the public's navigational right is paramount. On other navigable waters the right of the public to use the water is not paramount but must be balanced against the rights of riparians to make use of the water, bed, and banks of waterways.

Trespasses on private property are prohibited and may be remedied. Littering and disorderly conduct carry criminal and civil sanctions. The state is expected to carry out its duty to insure that the rights of riparians are adequately protected. Other contentions raised by the parties merit no discussion.

Accordingly, the order of the Court of Appeals in *Bott* is reversed and the case is remanded for further proceedings in accordance with this opinion. The judgment of the Court of Appeals in *Nicholas* is affirmed. No costs, a public question being involved.